ATTORNEY FOR APPELLANT
James Cupp
Michigan City, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Indianapolis, Indiana



FILED
May 14 2010, 3:10 pm

CLERK
of the supreme court,
court of appeals and
tax court

## In the
## Indiana Supreme Court

No. 46S05-0910-CR-431

CHAWKNEE CARUTHERS,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the LaPorte Superior Court, No. 46D01-0709-MR-160
The Honorable Kathleen B. Lang, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 46A05-0810-CR-623

**May 14, 2010**

**Shepard, Chief Justice.**

Chawknee Caruthers shot and killed Karim Turner after mistaking him for someone else, and a jury found Caruthers guilty of murder. During his trial, the court took security measures to address juror concerns that remain unspecified. He now appeals based on (1) the trial court's

failure to <u>sua sponte</u> interrogate the jury about the effect of these concerns on their impartiality, (2) his trial counsel's ineffectiveness, and (3) sufficiency of the evidence. We affirm.

**Facts and Procedural History**

During the evening of September 15, 2007, Chawknee Caruthers and his friend Krista Anderson were in her bedroom watching television and smoking marijuana when Santana Miller and one or two associates entered the room. Miller asked, "Man, you got my guns?" (Tr. at 138.) Confused because he did not know that Krista Anderson had promised to sell Miller some guns, Caruthers asked Miller to whom he was talking. Instead of answering, Miller repeated his inquiry, in response to which Caruthers lifted his shirt to show the other men he was not carrying a firearm. Miller then punched Caruthers. Apparently taken aback, Caruthers looked to Anderson for an explanation, when Miller punched him again. Anderson told Miller and his friends to leave; Miller proceeded to choke Caruthers and then finally departed.

Caruthers called one Richard Smith to come pick him up. Caruthers and Smith stopped at the home of Richard Smith's brother Corey, where Richard Smith showed Caruthers his brother's nine millimeter handgun. Corey Smith grabbed his gun from his brother, unloaded and cleared it, handed it back, and left to another room to talk to his wife. Richard Smith then followed Corey, leaving the gun with Caruthers. When Richard Smith returned, the gun was not visible.

The three men, who had been drinking at Corey Smith's, left at around 8:30 p.m. in a green Ford Escort to buy more alcohol at the liquor store. Richard Smith drove, Caruthers rode in the passenger seat, and Corey Smith, who was by now "stumbling drunk," sat in the back. (Tr. at 253, 520–21, 526.) As the three headed to the liquor store, Caruthers told the driver to head toward Pleasant Avenue. After they rode around the neighborhood for a time, Caruthers called someone to ask where Miller lived. They then looked for the house and drove around the

2

block two or three times until they saw people standing by a truck with a trailer carrying a lawnmower, on the street where they expected to find Miller. As they drove by, Caruthers declared, "That looked like the guy." (Tr. at 523.) Richard Smith drove around the block another time, when they saw the truck and trailer up the street and began to follow it. After a while, Richard Smith "lost interest in following the vehicle," so he again headed toward the liquor store, against Caruthers' wishes, where he purchased some alcohol. (Tr. at 524–26.) After leaving the liquor store, they pulled into an alley where Richard Smith began relieving himself; Caruthers once again spotted the group he thought included Miller. He told Smith to start driving. Caruthers eased out of the passenger window, reached in his pants, and, seated on the window and reaching across the car's roof, fired three or four shots at two individuals who had started to approach the car. (Tr. at 530–31.) Returning to his seat, he shouted at Smith to drive.

In fact, Miller was not one of the two people Caruthers shot at. Instead, they and the rest of the group had stopped to fix their trailer's tail-light on Miller's street, and Caruthers confused one of them for Miller in part because he and Miller had been wearing similar shirts. (Tr. at 17, 148.) The group had seen the green Escort pass by twice while they fixed the tail-light. When Caruthers spotted them later, they were unloading a lawnmower from the trailer in an empty lot. After spotting the green Escort yet again, this time in the nearby alley, two of them, Kersee Anderson and Karim Turner, walked toward the car to investigate. Caruthers shot Turner, thinking him to be Miller. Turner died of the gunshot in a matter of minutes.

The police arrested Caruthers the next day, thwarting his attempt to board a bus for Detroit. The State charged Caruthers with murder, and a jury trial commenced on July 28 and ended August 1, 2008. At the beginning of the last day, before the jury entered the courtroom, Caruthers' lawyer James Cupp made the following statement:

> There apparently is some information afloat which I would characterize as somewhat a thinly veiled allegation of jury tampering, and that concerns me greatly. Apparently, someone

3

> somewhere has received some information from a juror or jurors that one or more of them, the jurors, are feeling intimidated by actions that such juror or jurors attribute to my client. I wanted to make a record on that, Your Honor, because I think it's a very serious allegation and I just—I am thankful that the Court has given me an opportunity to do so.

(Tr. at 500–01.) Mr. Cupp did not ask the court to take any action, and the trial continued with the State's next witness. (Tr. at 501.) The jury convicted Caruthers of murder and found him to be a habitual offender.

At the sentencing hearing, Judge Lang addressed the security concerns mentioned at the jury trial. She opened the sentencing hearing by saying

> During the trial, an issue was raised by the defense that there was information concerning what was loosely referred to as jury tampering. Members of the jury did express security concerns on more than one occasion to the bailiff as a result of various family members of the victim, of the defendant, as well as the defendant himself. In response, the Court arranged for extra security and alternate parking in front of [the] exit and [the] entrance for the jurors. To allay the jurors['] concerns, the Court did personally inform the jurors of the additional security precautions that were in place and instructed them on the ministerial aspects of the precautions. At no time did any juror express to the Court that they had been personally approached or threatened after the security precautions were put in place and the concerns regarding personal safety were expressed to the bailiff or made known to the Court.

(Sent. Tr. at 1.)

The court sentenced Caruthers to sixty-five years for murder with a thirty-year enhancement for being a habitual offender. He appealed, arguing the trial court erred in failing to interrogate the jury on its own initiative regarding any prejudice that might have resulted from their feelings of intimidation. (Appellant's Br. at 11–12.) A divided Court of Appeals reversed

4

the conviction. <u>Caruthers v. State</u>, 909 N.E.2d 500 (Ind. Ct. App. 2009). We granted transfer. 919 N.E.2d 554 (2009) (table).

## Standard of Review

The failure to raise a claim of error generally waives that issue for appeal. <u>Clark v. State</u>, 915 N.E.2d 126, 131 (Ind. 2009). We nevertheless sometimes entertain such claims under fundamental error, meaning an error that makes a fair trial impossible or that constitutes a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm. <u>Id.</u> (citing <u>Benson v. State</u>, 762 N.E.2d 748 (Ind. 2002)).

## I.    Failure to Interrogate the Jury Was Not Fundamental Error.

The right to trial before an impartial fact-finder is a cornerstone of our justice system. Article 1, § 13 of the Indiana Constitution guarantees criminal defendants the right to trial by an impartial jury; therefore, a biased juror must be dismissed. <u>Joyner v. State</u>, 736 N.E.2d 232 (Ind. 2000). This right is an essential element of due process. <u>Mitchell v. State</u>, 726 N.E.2d 1228, 1236 n.4 (Ind. 2000); <u>Kennedy v. State</u>, 258 Ind. 211, 218, 280 N.E.2d 611, 615 (1972).

A juror's bias may be actual or implied, but a court must remove a juror for implied bias—that is, regardless of actual bias—only where a relationship exists between the juror and one of the parties. <u>Joyner</u>, 736 N.E.2d at 238 (concluding implied bias does not apply where defendant's acquaintances threatened juror). By stating he "was denied trial by an impartial

5

jury," Caruthers necessarily implies that jurors had actual bias, as he does not assert any juror had a disqualifying relationship with one of the parties.[1] (Appellant's Br. at 11.)

Upon a suggestion of extrajudicial comments made to a juror, the trial court should make a threshold assessment of the likelihood of resulting prejudice. Daniels v. State, 264 Ind. 490, 346 N.E.2d 566 (1976). If the court determines that no risk of substantial prejudice exists, it need not investigate further. Joyner, 736 N.E.2d at 239. If it finds the risk of prejudice is substantial, as opposed to imaginary or remote, it should interrogate the jury collectively to determine who if anyone has been exposed, and individually interrogate any such jurors away from the others. Id. (quoting Lindsey v. State, 260 Ind. 351, 358–59, 295 N.E2d 819, 824 (1976)). If the court determines any degree of exposure and the likely effect thereof, it must take appropriate action, including at least a collective admonishment. Daniels, 264 Ind. at 494, 346 N.E.2d at 568–69. At all stages in this process, the trial court has discretion to take what actions it deems necessary and appropriate.

Caruthers asserts the trial court failed "to ensure the absence of any bias resulting from security concerns of the jury." (Appellant's Br. at 12.) While courts have a duty to ensure an impartial jury, we have never held that they have the obligation to ensure the absence of any bias. To the contrary, we have long maintained that "jurors need not be absolutely insulated from all extraneous influences regarding the case and that such exposure, without a showing of influence, will not require a new trial." Lindsey, 260 Ind. at 357, 295 N.E.2d at 823 (citing Irvin v. Dowd, 366 U.S. 717 (1961)); see Lopez v. State, 527 N.E.2d 1119, 1130 (Ind. 1988)

---

[1] In fact, before the trial began but after the jury was selected and sworn, one of the jurors was questioned about her relationship to one of the witnesses. (Tr. at 1–4.) She was the aunt of one of the individuals at the empty lot the night of the shooting, but she did not know his last name. (Tr. at 2.) She assured the court that she would give her nephew's testimony no favoritism and that she had not discussed the case. (Tr. at 3–4.) After neither party objected, the court ruled she would remain on the jury. This ruling has never been challenged.

(requiring a showing that juror misconduct is gross and probably harmed the defendant before warranting a new trial).

Our evaluation of whether the trial court should have proceeded to the collective interrogation step described in Lindsey turns on whether Judge Lang could have reasonably concluded that there was little likelihood of actual prejudice. Though the record contains little information on this point, we know this much: the jurors expressed "security concerns" to the court, the court arranged for extra security, and the court informed the jurors about "the ministerial aspects of the precautions." (Sent. Tr. at 1.) We also know that no juror expressed "that they had been personally approached or threatened" after the concerns were raised to and addressed by the court. (Id.) That a jury had "security concerns" could mean anything from general fear of Caruthers as a murder defendant to actual threatening communication from family members.

We know only a little more about the measures taken, as the court simply described these as "extra security and alternate parking." (Sent. Tr. at 1.) Judge Lang could have ordered the heightened security measures to ease unsubstantiated anxiety or to prevent further improper activity. In any case, from her remedial action we can infer in very general terms her evaluation of the level of risk the jurors faced. As such, Caruthers essentially argues that the likelihood of prejudice requiring additional security measures as simple as alternate parking arrangements necessarily compelled the court to interrogate jurors under Lindsey. (Appellant's Br. at 12.) To require jury interrogation in any case that calls for heightened security measures would amount to an extreme precaution against jury bias.

Caruthers bases his argument on the presumption that jurors who felt intimidated by unspecified threats would as a consequence have a bias against the defendant. This is not unlike the defendant's argument in Joyner, 736 N.E.2d at 237–39. Joyner challenged the trial court's refusal to declare a mistrial where one of the jurors was threatened by the defendant's acquaintances. Id. at 238. Joyner did not allege actual bias but instead asserted that bias could

7

be inferred despite the juror's statement she could still be impartial.  Id. at 238.  As in Joyner, we cannot infer prejudice where none is shown and no relationship between a juror and a party existed.

Caruthers also argues that the trial court's attempt at addressing the jury's perception of intimidation amounted to "additional prejudicial action" because they signaled the court's endorsement of such concerns.  (Appellant's Br. at 12.)  The content of the judge's communication to the jury is not in the record, so we cannot evaluate it.  Again, Caruthers essentially asks us to hold that a court's off-the-record explanation of added security creates a presumption of jury bias so serious that it amounts to fundamental error.

We acknowledge that best practice would have been for the trial court to enter its observations into the record at the time action was taken, giving further description of the nature of the jurors' concerns and its reasoning for taking the security measures it did and not anything more.  That said, even reading the record in a light most favorable to Caruthers' claim does not lead us to conclude that the trial court's failure to interrogate the jury constituted a "blatant violation of basic and elementary due process" that undeniably made a fair trial impossible.  Clark, 915 N.E.2d at 131.

## II.	The Evidence Was Sufficient to Prove Murder.

Caruthers claims that the evidence identifying him as the perpetrator was "inherently improbable."  (Appellant's Br. at 13.)  He asserts that the only two witnesses who identified the shooter gave inherently improbable testimony because one of them (Corey Smith) was intoxicated and the other (Richard Smith) was also charged with Karim Turner's death.  (Appellant's Br. at 13–14.)  He points out that Richard Smith spent several months in jail before charges against him were dismissed and that it was Smith's wife who removed any fingerprints from the gun.  (Appellant's Br. at 14.)

In considering challenges to the sufficiency of the evidence, we neither reweigh the evidence nor judge witness credibility. We affirm if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. Jones v. State, 783 N.E.2d 1132 (Ind. 2003).

The Smith brothers were not the only witnesses leading the jury to convict Caruthers. Krista Anderson and Santana Miller both testified about the altercation at Anderson's home. (Tr. at 138, 230.) Several witnesses described Caruthers' demeanor and comments after this encounter and before the shooting, like, "Man, I think I got him." (Tr. at 139–43, 284, 450, 533.) At least three witnesses described Richard Smith showing Caruthers his brother's gun that night. (Tr. 310–11, 451–52, 516–18.) At least two witnesses stated Caruthers admitted to the shooting. (Tr. at 147, 586.) Considering all the evidence most favorable to the verdict and drawing all reasonable inferences therefrom, we conclude that the jury could have reasonably found Caruthers guilty.

### III. The Claim of Ineffective Assistance Is Unavailable Here.

Caruthers argues that his trial counsel was ineffective on several grounds. (Appellant's Br. at 5–10.) His appellate counsel making these arguments also served as trial counsel.[2] Arguing one's own ineffectiveness is not permissible under the Rules of Professional Conduct.

---

[2] It is unclear who represented Caruthers at the time he waived his right to a speedy trial, the basis of one of his claims. (App. at 3.) Attorney James Cupp, who represents Caruthers on this appeal, certainly represented him during the guilt phase and the habitual offender phase. (App. at 2–3, 6.) Rather than speculating on the identity of the lawyers involved at the time, we leave this issue to be taken along with the other ineffectiveness claims that would benefit from a more thorough investigation.

Ind. Professional Conduct Rule 1.7(a); <u>Etienne v. State</u>, 716 N.E.2d 457, 463 (Ind. 1999). <u>Etienne</u> pointed out that to rule on the merits of such a claim on direct appeal would foreclose the defendant "from ever having a fresh set of eyes consider and argue the effectiveness of his or her trial counsel." <u>Etienne</u>, 716 N.E.2d at 463.[3] This problem arises because an ineffective assistance of trial counsel claim is foreclosed in post-conviction proceedings if it is raised on direct appeal. <u>Woods v. State</u>, 701 N.E.2d 1208 (Ind. 1998).

As in <u>Etienne</u>, Caruthers' present "ineffectiveness claim is little more than a rehashing of his other claims and presents no basis for an exception." <u>Id.</u> While <u>Etienne</u> explicitly acknowledged that there may come a case in which immediately reviewing trial counsel's performance is appropriate, this is not that case. <u>Id.</u> We therefore decline to consider these arguments.

**Conclusion**

We affirm the trial court.

Dickson, Sullivan, Boehm, and Rucker, JJ., concur.

---

[3] Although Rule 1.7 has been amended since <u>Etienne</u>, its effect remains the same.