FILED

May 10 2016, 5:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Matthew D. Anglemeyer
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael Pugh,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 10, 2016

Court of Appeals Case No.
49A02-1506-CR-483

Appeal from the Marion Superior
Court.
The Honorable Lisa F. Borges,
Judge.
Cause No. 49G04-1311-FA-71137

**Sharpnack, Senior Judge**

# Statement of the Case

Michael Pugh appeals his convictions of two counts of rape,[1] both Class A felonies; one count of attempted criminal deviate conduct,[2] a Class A felony; one count of robbery,[3] a Class B felony; three counts of carjacking,[4] all Class B felonies; one count of robbery, a Class A felony; one count of robbery, a Class C felony; and one count of burglary,[5] a Class A felony. We affirm.

# Issues

Pugh presents six issues for our review, which we consolidate and restate as:

I. Whether the trial court abused its discretion by admitting evidence obtained as a result of an alleged unlawful seizure of Pugh.

II. Whether there was sufficient evidence to convict Pugh as an accomplice of rape, attempted criminal deviate conduct, and carjacking.

III. Whether Pugh's convictions of three counts of robbery violate the single larceny rule.

IV. Whether Pugh's two rape convictions constitute a single offense under the continuing crime doctrine.

---

[1] Ind. Code § 35-42-4-1 (1998).

[2] Ind. Code §§ 35-41-5-1 (1977); 35-42-4-2 (1998).

[3] Ind. Code § 35-42-5-1 (1984).

[4] Ind. Code § 35-42-5-2 (1993).

[5] Ind. Code § 35-43-2-1 (1999).

> V.  Whether the trial court erred in denying Pugh's motion for a mistrial.

# Facts and Procedural History

[3] Beginning in the late evening hours of October 28, 2013, and into the early morning hours of October 29, 2013, Pugh, Trae Spells, Alexander Dupree, Adrian Anthony, and Demetre Brown were hanging out at an apartment at 34th and Meridian Streets in Indianapolis. During their time together, these men drank alcohol, smoked marijuana laced with embalming fluid, and consumed Spice[6] and pills. At some point, the five men left the apartment and drove to a liquor store in a Thunderbird that Pugh had borrowed. At the liquor store they bought a bottle of peach vodka that everyone in the car shared. They then drove to a neighborhood where they obtained cocaine. They all used the cocaine, drove back to the liquor store for more alcohol, and then drove to a party. Eventually the five men left the party taking Isaiah Hill with them.

[4] That same night, a family consisting of a husband, wife, and adult daughter, living in a home on the northeast side of Indianapolis, did not close their overhead garage door nor lock the access door from the garage to the home when they went to bed. At approximately 5:15 a.m., after having consumed the alcohol and drugs, the carload of men drove through the neighborhood and

---

[6] Spice is a mix of herbs and manmade chemicals with mind-altering effects. It is often called "synthetic marijuana" or "fake weed" because some of the chemicals in it are similar to ones in marijuana; but its effects are sometimes very different from marijuana, and frequently much stronger. NIDA FOR TEENS, http://teens.drugabuse.gov/drug-facts/spice (last visited May 2, 2016).

noticed the open garage door. The men parked down the street and walked up the driveway of the house and into the garage. Once in the garage, the men each took gloves they found in the garage and put them on, except Spells who had his own gloves. Pugh opened the unlocked access door to the house, and the group entered the home. Brown and Anthony had guns, and the gun carried by Brown belonged to Pugh.

[5] The men went upstairs where the bedrooms were located, and Anthony went into the room of the husband and wife wielding his gun. The husband and wife were awakened by the bedroom light being turned on and male voices around their bed repeatedly yelling for cash, cell phones, and guns and threatening them that if they lied or failed to keep their heads down, they would be killed. The daughter, in her bedroom, awoke to people yelling for cash in her parents' bedroom. She took her purse into their bedroom and handed it to the first person she came upon hoping to placate the intruders. Spells and Brown escorted her back to her bedroom and told her to lie face down on her bed while they searched her room for items to steal. One of them told the daughter she had "a nice butt," and someone touched her leg and then moved his hand up her leg and inside her shorts to touch her vaginal area. Tr. p. 173. The men asked the daughter if she had any money, and she responded that she had a student loan of $9,000 in her bank account.

[6] The husband, who has a neurological disorder that makes it very difficult for him to walk without braces on his legs, was told to stay in bed with the sheet over his head. At one point, the men asked the husband a question and, when

he did not respond quickly enough, they hit him over the head with the drawer of the nightstand saying that when they asked a question they expected an answer right away.

[7] Meanwhile, the wife attempted to get to the phone in an upstairs office to call 911, but as she was running down the hallway Anthony shot her in the hip. Bleeding from the wound, the wife was taken downstairs and walked out to one of the family's cars. Again, she attempted to run for help, but she tripped and fell. She was tackled and dragged back into the house where Anthony shot her in the foot. She fell to the floor, and one of the men kicked her in the head so hard she saw blue and stars.

[8] Having been shot twice and kicked in the head, the wife was then taken out to one of the family's cars and put in the back seat with Anthony, while another of the men drove the car to an ATM. On the drive, the men showed the wife the ATM card they had taken from the house. She told them the card was her daughter's and that she did not know the pin number, so the men turned around and drove back to the house. On the way, Anthony pulled down the wife's pants and attempted anal intercourse while he was groping her body with his hands. When that proved unsuccessful, Anthony turned the wife around and forced her to perform fellatio. When he ejaculated into her mouth, he threatened her, "You better swallow or I'll kill you." *Id.* at 111. The wife yielded to the threat. Anthony checked her mouth and then wiped out her mouth with a piece of cloth.

[9] After returning to the house and getting the husband's ATM card, the wife was forced to drive the car back to the ATM with Anthony in the front passenger seat holding a gun on her. During the drive, the wife initiated a personal conversation with Anthony in an attempt to "make him think about what he was doing" and make him realize that it "wasn't something that he had to be doing." *Id.* at 117. The wife withdrew $800 at the ATM and was told to get more in a second transaction, but that transaction was denied. Anthony also told the wife to tell his cohorts that the amount she was able to withdraw was $500.

[10] Following the ransacking of the daughter's room, Spells led her downstairs to the kitchen area, sat her in a kitchen chair, and told her to keep her eyes shut or she would be shot. Hill grabbed the daughter by her hair and forced her into a small bathroom off the kitchen. Dupree also went into the bathroom. Hill sat on the toilet and Dupree sat on the sink. While Dupree forced the daughter to perform fellatio, Hill attempted to have forced vaginal intercourse with her from behind. When Dupree was finished, Hill took the daughter into the den and put her on a couch. Spells, Dupree and Brown followed them into the den. Hill then forcibly had vaginal intercourse with the daughter while commanding her "[M]oan, bitch." *Id.* at 204. When Hill finished, Dupree attempted anal intercourse, but was unsuccessful. Dupree then forced vaginal intercourse on the daughter. When Dupree finished, Brown moved the daughter from the couch to the floor and then forced vaginal intercourse on her. Spells left the den and went to the stairs where he encountered Pugh. Pugh asked what was

happening, and Spells told him the men were having sex with the daughter, which Pugh said he did not believe. Pugh instructed Spells to go upstairs to the second floor to guard the husband, and he continued on down the stairs. Spells went upstairs, checked on the husband, and then returned to the first floor. When Spells returned to the den, Brown finished and told Spells to "get some." *Id.* at 1028. Initially Spells declined but then went ahead and had vaginal intercourse with the daughter.

[11] When the wife and Anthony returned to the house, the daughter was being led out to a car. The wife asked to be allowed to go with her daughter or to go in her stead because she could see that her daughter was upset and she knew her daughter was not good with directions. Her plea was refused, and she was taken into the house and told to lie down in the entryway.

[12] Anthony then took the daughter to the ATM at gunpoint. While she was withdrawing the money, he reached across the seat and began touching her vagina. At a stoplight on the return trip, Anthony demanded that the daughter kiss him.

[13] Meanwhile, as the wife was lying in the entryway, the voices and noise gradually decreased. As the wife started to get up to go for help, the front door opened, and her daughter and Anthony entered. Anthony asked where the other men were, and the wife told him they were gone. Anthony took the women upstairs to the master bedroom, told them to lie down on the floor, and left the house. The men took three of the family's four cars that they had

loaded with items from the house and then transferred the stolen items to a shed behind Dupree's mother's house.

[14]    The next day, officers investigating the home invasion learned that a print taken from the sink in the downstairs bathroom of the home had been connected to Dupree. The ensuing investigation of Dupree included his cell phone records, which showed frequent interaction between Dupree's number and a number that the police database linked to Pugh. In addition, the police pulled a photo of Pugh that showed he wore his hair in dreadlocks. The victims had told the police that one of the men that invaded their home had dreadlocks. Based upon this information, the police began surveillance of Pugh as well.

[15]    Later that day, officers located Pugh driving the Thunderbird in Indianapolis and to the apartment at 34th and Meridian Streets where the men had been the previous night. The police also had information that Dupree's cell phone was in the same apartment building at the time Pugh went there. Pugh parked and went into the apartment building. Later, Pugh, and two other persons the police could not identify by sight, exited the building and got into the Thunderbird. The driver of the Thunderbird began to drive away, with Pugh as the front passenger, but then immediately pulled into an alley and stopped. At that time, the order was given for officers to approach the vehicle. The officer who first approached the Thunderbird saw Pugh lean forward and then down "as though he were reaching or retrieving something from under the . . . seat." *Id.* at 936. Pugh was removed from the car and handcuffed, the officer then saw the butt of a gun sticking out from under the front passenger seat. After

being advised of his *Miranda* rights, Pugh stated that the gun was his, he was the only person that would have possession of the handgun, and he was the last person to have possession of that handgun. The officers seized the gun, and subsequent testing revealed that blood splattered inside the end of the barrel belonged to the wife.

[16] Based upon this violent home invasion, Pugh was charged with thirty-five counts: four counts of rape, as Class A felonies; twelve counts of criminal deviate conduct, as Class A felonies; two counts of attempted criminal deviate conduct, as Class A felonies; three counts of carjacking, as Class B felonies; two counts of robbery, as Class B felonies; three counts of criminal confinement, as Class B felonies; two counts of intimidation, as Class C felonies; one count of aggravated battery, as a Class B felony; one count of robbery, as a Class A felony; one count of battery by bodily waste, as a Class A misdemeanor; two counts of battery, as Class C felonies; one count of battery, as a Class A misdemeanor; and one count of burglary, as a Class A felony.

[17] Prior to trial, Pugh filed a motion to suppress alleging the officers illegally seized him, which resulted in the illegal seizure of his handgun and his statement to police. Following a hearing on Pugh's motion, the trial court denied it. At trial, Pugh objected to the admission of the handgun as well as his statement to the police, but the trial court overruled his objection and admitted the evidence. Near the end of trial, Pugh moved for a mistrial after the bailiff informed the court that two jurors had inquired as to what Pugh was drawing during the trial proceedings. The trial court denied Pugh's motion.

[18] At the conclusion of its evidence, the State dismissed seven of the charges against Pugh, and the remaining twenty-eight charges were submitted to the jury. The jury found Pugh guilty of twenty of those charges. At sentencing, the trial court vacated ten counts, and reduced one count of Class B felony robbery to a Class C felony. The trial court sentenced Pugh to an aggregate sentence of 248 years. This appeal ensued.

## Discussion and Decision

### I. Admission of Evidence

[19] Pugh contends the trial court abused its discretion by admitting into evidence the seized handgun, his statement concerning the gun, and the results of testing on the gun. Specifically, Pugh asserts that the officer lacked reasonable suspicion to conduct an investigatory stop and thus violated his rights under both the federal and state constitutions.

[20] The trial court is afforded wide discretion in ruling on the admissibility and relevancy of evidence. *Nicholson v. State*, 963 N.E.2d 1096, 1099 (Ind. 2012). On appeal, evidentiary decisions are reviewed for abuse of discretion and are reversed only when the decision is clearly against the logic and effect of the facts and circumstances. *Id.* In reviewing a trial court's ruling on the admissibility of evidence from an allegedly illegal search, we do not reweigh the evidence. *Reinhart v. State*, 930 N.E.2d 42, 45 (Ind. Ct. App. 2010). Rather, we defer to the trial court's factual determinations, unless clearly erroneous, and we consider conflicting evidence most favorable to the trial court's ruling. *Id.*

Further, we consider anew any legal question of the constitutionality of a search or seizure. *Id.*

[21] The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. Likewise, article I, section 11 of the Indiana Constitution protects citizens from unreasonable searches and seizures. Despite the similarity of the two provisions, Indiana courts interpret and apply article I, section 11 independently from Fourth Amendment analysis. *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001).

### *Fourth Amendment*

[22] Permissible under the Fourth Amendment's protection against unreasonable searches and seizures is the *Terry* stop. A *Terry* stop allows an officer to briefly stop an individual for investigatory purposes if, based upon specific, articulable facts, the officer has a reasonable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Reasonable suspicion entails at least a minimal level of objective justification that is more than an unparticularized suspicion or hunch. *State v. Campbell*, 905 N.E.2d 51, 54 (Ind. Ct. App. 2009), *trans. denied*. However, the reasonable suspicion necessary for a *Terry* stop need not rise to the level of suspicion required for probable cause. *Id*. Whether the officer's suspicion was reasonable is a fact-sensitive inquiry that must be determined on a case-by-case basis by considering the totality of the circumstances. *Rutledge v. State*, 28 N.E.3d 281, 291 (Ind. Ct. App. 2015). For instance, a set of individually innocent facts, when observed in combination, can be sufficient to create reasonable suspicion

of criminal activity. *Finger v. State*, 799 N.E.2d 528, 534 (Ind. 2003). In assessing the reasonableness of investigatory stops, courts must strike "a balance between the public interest and the individual's right to personal security free from arbitrary interference by law [enforcement] officers." *Carter v. State*, 692 N.E.2d 464, 466 (Ind. Ct. App. 1997).

[23] Here, the officers had information that Dupree's print had been found in the home, and they were trying to locate Dupree. In addition, because the victims had indicated to police that it was a group of men that had invaded their home, the officers were looking into anyone associated with Dupree. As part of the investigation, the officers obtained Dupree's cell phone records. These records showed frequent interaction between Dupree's cell phone and a cell phone number identified as Pugh's. The officers then obtained a photo of Pugh which showed he had dreadlocks. Although the victims could give very little information about the men, they had indicated that one of the men had dreadlocks. Based upon this description and his connection to Dupree, Pugh was put under police surveillance.

[24] On October 30, 2013, officers had information that Dupree's cell phone was in an apartment building at 34th and Meridian Streets. That same day, officers were conducting surveillance on Pugh when he drove to that apartment building at 34th and Meridian Streets and went inside. He eventually exited the building with two persons police could not identify by sight because they were wearing hoodies. Pugh and the two others got into the car, with Pugh as the front passenger, and immediately pulled into an alley. When one of the officers

conducting the surveillance approached the vehicle, he saw Pugh lean forward and then down toward the floorboard. For safety, the officer removed Pugh from the car and then saw the butt of a handgun sticking out from under the seat.

The totality of these circumstances indicate that when the officers detained Pugh, they already knew Dupree had been involved in the violent home invasion because of the print he left behind. They knew that Dupree's cell phone was in the apartment building at the time that Pugh was there, that Dupree and Pugh were closely connected, and therefore that it was possible that Dupree was in the vehicle with Pugh. On these facts, we find the reasonable suspicion standard to be satisfied.

### *Article I, Section 11*

Concluding that the detention did not violate Pugh's Fourth Amendment rights, we now turn to the separate argument under the Indiana Constitution. "The legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). The reasonableness of a search or seizure turns on a balance of: (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizens' ordinary activities, and (3) the extent of law enforcement needs. *Myers v. State*, 839 N.E.2d 1146, 1153 (Ind. 2005). As we consider the reasonableness of a search or seizure, we give section 11 a liberal construction in favor of protecting

individuals from unreasonable intrusions on their privacy. *State v. Gerschoffer*, 763 N.E.2d 960, 965 (Ind. 2002).

[27] In this case the degree of concern, suspicion, or knowledge held by the police was strong. The crimes they were investigating were serious, and they had solid evidence linking Dupree to these crimes. The police had further evidence linking Pugh to Dupree and a description from the victims that matched Pugh.

[28] The degree of intrusion was minimal here. The car in which Pugh was riding was already stopped in the alley when the officer approached, and the officers' main objective was to see if Dupree was in the car. It was Pugh's movement inside the car in an effort to hide his gun that caused the interaction to intensify.

[29] Lastly, the extent of law enforcement needs was great. The police were investigating a very violent home invasion where they had few leads. When they stopped the car, they were investigating the one piece of solid evidence they had by trying to locate Dupree as quickly as possible. Under the totality of the circumstances presented here, we conclude that the actions of the officers were reasonable.

[30] Thus, we hold there was no violation of Pugh's rights under either the Fourth Amendment or article 1, section 11. Accordingly, the trial court's admission of the evidence flowing from the investigatory stop of Pugh was not in error.

## II. Sufficiency of the Evidence

[31] Pugh was convicted under the theory of accomplice liability of two counts of rape of the daughter, one count of attempted criminal deviate conduct with regard to the daughter, and three counts of carjacking. He challenges all of these convictions on the basis that the State failed to present evidence sufficient to support them.

[32] When we review a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of the witnesses. *Brasher v. State*, 746 N.E.2d 71, 72 (Ind. 2001). Instead, we consider only the evidence most favorable to the verdict and any reasonable inferences drawn therefrom. *Id.* If there is substantial evidence of probative value from which a reasonable fact-finder could have found the defendant guilty beyond a reasonable doubt, the verdict will not be disturbed. *Dillard v. State*, 755 N.E.2d 1085, 1089 (Ind. 2001).

[33] In order to convict Pugh of rape, attempted criminal deviate conduct, and carjacking as an accomplice, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally aided, induced, or caused another person to commit these offenses. *See* Ind. Code § 35-41-2-4 (1977). It is not necessary that the evidence show the accomplice personally participated in the commission of each element of the offense. *Griffin v. State*, 16 N.E.3d 997, 1003 (Ind. Ct. App. 2014). A person who aids another in committing a crime is just as guilty as the actual perpetrator. *Lothamer v. State*, 44 N.E.3d 819, 822

(Ind. Ct. App. 2015), *trans. denied*. Moreover, the accomplice is "criminally responsible for everything which follows incidentally in the execution of the common design, as one of its natural and probable consequences, even though it was not intended as part of the original design or common plan." *Griffin*, 16 N.E.3d at 1003.

[34] There is no bright-line rule in determining accomplice liability; rather, the particular facts and circumstances of each case must be considered to determine whether a person participated in the offense as an accomplice. *Castillo v. State*, 974 N.E.2d 458, 466 (Ind. 2012). In order for an accomplice's conviction to stand:

> [T]here must be evidence of his affirmative conduct, either in the form of acts or words, from which an inference of a common design or purpose to effect the commission of a crime may be reasonably drawn. Each participant must knowingly or intentionally associate himself with the criminal venture, participate in it, and try to make it succeed. That said, the State need not show that [he] was a party to a preconceived scheme; it must merely demonstrate concerted action or participation in an illegal act.

*Griffin*, 16 N.E.3d at 1003-04 (citations omitted).

[35] While a defendant's presence at the scene or lack of opposition to a crime, standing alone, is insufficient to establish accomplice liability, courts may consider presence in conjunction with other factors to determine whether one acted as an accomplice to a crime. *Tuggle v. State*, 9 N.E.3d 726, 736 (Ind. Ct. App. 2014), *trans. denied*. The four factors relevant to this inquiry are: (1)

presence at the scene of the crime, (2) companionship with another at the scene of the crime, (3) failure to oppose commission of the crime, and (4) course of conduct before, during, and after occurrence of the crime. *Id.*

### *(1) Presence at the Scene*

[36] The evidence shows that Pugh donned a pair of gloves from the victims' garage and that he led the gang into the house. For at least part of the time, he guarded the husband on the second floor of the house, and he remained in the home during the hours-long, violent home invasion.

### *(2) Companionship at the Scene*

[37] The State presented evidence that Pugh provided the transportation to the scene in the borrowed Thunderbird. He was the first to enter the home from the garage with five other men, all of whom put on gloves before they entered the home. All of the men, including Pugh, went to the second floor of the home and confronted the sleeping family. Two of the men were armed with handguns, one of which belonged to Pugh. Pugh coordinated his behavior with that of his confederates during the violent, hours-long ordeal as they completely ransacked the house and shot the wife twice with his gun. While the men were searching the house, they called out to each other, sharing information concerning items of value they found or information they coerced from the victims. Pugh was present on the second floor of the home guarding the husband during part of the time that his confederates were raping and sexually violating the daughter on the first floor. When Pugh left his post guarding the

husband and went to the first floor, he was specifically told that the rapes were occurring.  Further, while the father was being guarded and the wife and daughter were enduring being shot and sexually violated, the men were loading the family's property into at least one of the family's cars.  When the men had completed their raid, Spells left the house and was stopped by Pugh who told him that Anthony would be returning and that he was to go back to the house and wait for Anthony.  Then Hill and Dupree drove the victims' Mitsubishi, Spells drove the victims' Infiniti, and Anthony drove the victims' Ford.  Pugh followed in the Thunderbird.  The State's evidence plainly demonstrates Pugh's companionship with the other five men.

### (3) Failure to Oppose Commission of the Crime

[38]  Pugh argues that because he did not believe his cohorts were raping the daughter, as evidenced by his statement to Spells, he cannot be said to have failed to oppose them.  However, the evidence demonstrates that Pugh was in the home while these acts were occurring and that he need not have been physically present on the first floor to know what occurred there.  The father, who was in his bedroom on the second floor, could hear "whooping going on so [he knew] that there[ ] [was] activity going on in the den, which is – which is down on the first floor.  And [he heard] at one point somebody come out and go, 'Woo wooo.'"  Tr. p. 287.  Moreover, even if Pugh did not believe Spells when he specifically told Pugh that their confederates were raping the daughter, he continued downstairs to the first floor armed with this information and did nothing to verify it and to stop or protest his confederates' actions.  The jury

could reasonably conclude that Pugh knew, and possibly saw, what was happening yet did nothing to oppose the crimes being committed.

## (4) Course of Conduct

[39]    Pugh provided transportation during the evening's activities of drug and alcohol gorging and to the home invasion, as well as providing one of the two handguns used in these offenses. He put on gloves before entering the home, and he led the gang's entry into the home. For at least part of the time, he guarded the husband upstairs while the others ransacked the house and committed sex acts against the daughter. The State's evidence demonstrated, generally, that the men loaded items of value from the home into at least one of the family's cars. Pugh and the men left the residence and met up at a house. At some point, they transferred the stolen items from the cars to a shed behind Dupree's mother's house. Pugh, with Spells, Anthony, Brown, and Dupree, sold some of the victims' property. The day after the home invasion, Pugh gave a friend a gold Michael Kors watch that the wife later identified as hers. The State also presented evidence that Pugh's cell phone number appeared frequently in Dupree's cell phone records. And, when Pugh was apprehended the day after the home invasion, he was in possession of the handgun he admitted was his and which was later shown to have been the gun that was used to shoot the wife.

[40]    We come to the question of whether the sex crimes of which Pugh was convicted were natural and probable consequences of the home invasion for the purpose of stealing whatever valuable property the six could find. Even though

such sex acts may not have been contemplated as part of the original purpose for the home invasion, Pugh would be liable as an accomplice for everything that followed incidentally as a natural and probable consequence of the invasion. *See Griffin*, 16 N.E.3d at 1003 (accomplice is responsible for everything which follows incidentally in execution of common design even though not part of original plan).

[41] Here, the six males, after extensive use of drugs and alcohol, set out armed to find a home they could invade and burgle. The home they chose, given the circumstances, was likely occupied. The six went in prepared to do whatever they needed to do to succeed, and indeed they did. The six men used terror and intimidation to dominate and control their victims so they could strip them of their property. Where, as here, there are female victims, such domination and control can probably and naturally lead to acts of sexual domination and control like rape and criminal deviate conduct. The evidence in this case was sufficient to support the convictions of Pugh as an accomplice to rape and attempted criminal deviate conduct.

[42] The main purpose of this home invasion was to take property of value. Taking the family's vehicles was taking property of value and was ancillary to transporting the valuables taken from inside the home. The Thunderbird was not enough, alone, to transport the six men as well as all the stolen property. The State presented sufficient evidence to demonstrate that Pugh was an accomplice to the carjackings.

# III. Single Larceny Rule

[43] Next Pugh argues that his three robbery convictions violate the single larceny rule such that two of his convictions must be vacated. The single larceny rule has historically provided that "when several articles of property are taken at the same time, from the same place, belonging to the same person or to several persons there is but a single 'larceny', i.e. a single offense." *Raines v. State*, 514 N.E.2d 298, 300 (Ind. 1987). The rationale behind this rule has been that the taking of several articles at the same time from the same place is pursuant to a single intent and design, thus constituting one offense. *Id.* However, we note that although the single larceny rule has long been entrenched in Indiana law, over time the Indiana Supreme Court has substantially limited its application. *See Curtis v. State*, 42 N.E.3d 529, 534-37 (Ind. Ct. App. 2015) (discussing *Ferguson v. State*, 273 Ind. 468, 405 N.E.2d 902 (1980); *McKinley v. State*, 272 Ind. 689, 400 N.E.2d 1378 (1980); and *Bivins v. State*, 642 N.E.2d 928 (Ind. 1994)), *trans. denied*.

[44] The State charged Pugh with three counts of robbery, with each count alleging a different victim. Count XIII alleged the men took from the daughter "currency, and/or computer, and/or jewelry, and/or keys, and/or television, and/or cellular phone." Appellant's App. pp. 156-57. Count XVIII alleged the men took from the wife "currency, and/or watch, and/or jewelry, and/or keys, and/or television, and/or cellular phone." *Id.* at 158. In a similar manner, Count XXXIII alleged the men took from the husband "currency, and/or computer, and/or television, and/or cellular phone, and/or keys." *Id.* at 163.

Pugh claims that the items were all taken pursuant to a single intent and were all part of the same criminal transaction. He also asserts that it makes no difference that the items belonged to three different individuals.

[45] Our Supreme Court has held that the single larceny doctrine "does not apply to the situation [ ] where a robber has taken the individual property of separate individuals." *Ferguson*, 273 Ind. at 475, 405 N.E.2d at 906. Moreover, relief under the single larceny rule may be had only where the conduct constitutes a single act or transaction. *Borum v. State*, 951 N.E.2d 619, 627 (Ind. Ct. App. 2011). In this case, the men's actions occurred over an extended period of time and constituted multiple transactions. The men took property belonging separately to the husband, the wife, and the daughter over a period of several hours in the home. In addition, the wife was taken separately at gunpoint to a bank location several blocks away and was robbed of the money she obtained from her bank account. When the wife was returned to the home, the daughter was then taken separately at gunpoint to the bank location and was robbed of the money she obtained from her bank account. Thus, the single larceny rule does not apply here where the robbery of the husband, the robbery of the wife, and the robbery of the daughter were distinct transactions, some of which occurred at neither the same place nor the same time. *See Bivins*, 642 N.E.2d at 944-45 (no violation of single larceny rule where defendant convicted of one count of theft for taking victim's money, credit card, and car keys from motel room and second count of theft for taking victim's car from motel parking lot).

# IV. Continuing Crime Doctrine

[46] Pugh claims that the two rapes of which he was convicted constitute a single transaction under the continuing crime doctrine such that one conviction should be vacated. The continuing crime doctrine establishes that actions that are sufficient to constitute separate criminal offenses may be so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction. *Riehle v. State*, 823 N.E.2d 287, 296 (Ind. Ct. App. 2005), *trans. denied*. The doctrine involves those instances where a defendant's conduct amounts to only a single, chargeable crime such that the State is prevented from charging a defendant twice for the same offense. *Id.*

[47] Here, Count III charged that Demetre Brown, Adrian Anthony, Alexander Dupree, Michael Pugh, Trae T. Spells and Isaiah Hill did knowingly have sexual intercourse with the daughter when she was compelled by deadly force or the threat of deadly force inside the bathroom and/or den. Appellant's App. p. 152. Count IX charged that Demetre Brown, Adrian Anthony, Alexander Dupree, Michael Pugh, Trae T. Spells and Isaiah Hill did knowingly have sexual intercourse with the daughter when she was compelled by deadly force or the threat of deadly force inside the den. *Id.* at 155. Pugh argues that both offenses had to have occurred in the den because the daughter testified that there was no penetration in the bathroom and that all the rapes in the den occurred "one immediately after the other" so as to constitute a single offense. Appellant's Br. p. 42.

[48] As to the rape that occurred in the bathroom, the daughter testified at trial as follows:

> Daughter: I could just like feel their penis kind of touching my vagina.
>
> Counsel: You say, kind of touching?
>
> Daughter: It's the outside of my vagina. I guess they weren't really able to like penetrate I guess at that point.
>
> Counsel: Okay. So when you say that they were trying to, then that you mean that the penis was touching your vagina, but they weren't able to achieve a full penetration?
>
> Daughter: I don't think so, yeah.

Tr. p. 197. Indiana Code section 35-31.5-2-302 (2012) defines sexual intercourse as an act that includes any penetration of the female sex organ by the male sex organ. This Court has clarified that this statute does not require that the vagina be penetrated; instead, evidence of the slightest degree of penetration by the male sex organ of the female sex organ, including the external genitalia, is sufficient. *See Atteberry v. State*, 911 N.E.2d 601, 609 (Ind. Ct. App. 2009). Thus, the daughter was raped in the bathroom. She was then moved out of the bathroom and into the den where she was raped four more times by three different men. Accordingly, these facts demonstrate at least two distinct offenses of rape and the continuing crime doctrine is not applicable.

[49] Furthermore, even if Count III was considered as a rape that occurred in the den and not the bathroom, the continuing crime doctrine would still not apply. The evidence was clear that four different rapes occurred in the den. The

daughter was taken into the den and first raped on the couch by Isaiah Hill. Hill removed himself, and Dupree raped the daughter after unsuccessfully attempting anal intercourse. Brown then moved the daughter from the couch to the floor and raped her, after which, Spells raped her.

[50] We find these facts similar to those in *Firestone v. State*, 838 N.E.2d 468 (Ind. Ct. App. 2005). There, Firestone raped his victim while another person held her down. Firestone then climbed on top of her, held her down, and forced her to perform fellatio on him. This Court held that Firestone had clearly committed two different offenses at different times by first having his penis penetrate the victim's vagina and then, in a separate offense, placing his penis in her mouth. *Id.* at 472.

[51] The continuous crime doctrine applies only where a defendant has been charged multiple times with the same "continuous" offense. *Hines v. State*, 30 N.E.3d 1216, 1220 (Ind. 2015). The continuity of these men's actions (i.e., raping the daughter in succession) does not negate the fact that these acts were completely separate offenses committed at separate times, some in a separate place (couch/floor), and each time by a different perpetrator. Following the logic of *Firestone*, these men clearly committed distinct, chargeable crimes at different times. Therefore, the rape in the bathroom and each rape in the den was separate in time from the other, and the continuing crime doctrine does not apply to Pugh's rape convictions.

# V.    Motion for Mistrial

Finally, Pugh asserts that the trial court erred by denying his motion for a mistrial. A mistrial is an extreme remedy warranted only when no other curative measure will rectify the situation. *Donnegan v. State*, 809 N.E.2d 966, 972 (Ind. Ct. App. 2004), *trans. denied*. To prevail on appeal from the denial of a motion for mistrial, the defendant must establish that he was placed in a position of grave peril to which he should not have been subjected. *Williams v. State*, 755 N.E.2d 1128, 1132 (Ind. Ct. App. 2001), *trans. denied*. The gravity of the peril is determined by considering the misconduct's probable persuasive effect on the jury's decision. *Id.* A trial court is in the best position to determine whether a mistrial is warranted because it evaluates first-hand all relevant facts and circumstances at issue and their impact on the jury. *Weisheit v. State*, 26 N.E.3d 3, 15 (Ind. 2015), *cert. denied*, 136 S. Ct. 901, 193 L. Ed. 2d 796 (2016). Accordingly, we review the trial court's denial of a motion for a mistrial for an abuse of discretion. *Id.* "However, the correct legal standard for a mistrial is a pure question of law, which we review de novo." *Ramirez v. State*, 7 N.E.3d 933, 935 (Ind. 2014).

On the last day of trial, the court notified the parties that two jurors had asked the bailiff what Pugh was drawing and that the jurors had expressed concern that he was drawing pictures of them. Pugh's counsel responded that he had asked Pugh to do something during trial to distract himself so Pugh was drawing pictures of his wife and kids. Counsel expressed concern about the impartiality of the jurors and requested that the two jurors be individually

questioned. The State objected to questioning the jurors, and the trial court denied Pugh's request. Thereafter, Pugh requested that both jurors be removed and moved for a mistrial. The trial court denied both motions. Pugh's drawings were made a part of the record on appeal.

[54] The right to an impartial jury is a constitutional right and an essential element of due process. *Caruthers v. State*, 926 N.E.2d 1016, 1020 (Ind. 2010). Biased jurors must be dismissed, and when there is a suggestion that they have been exposed to extrajudicial matters, the trial court should make a threshold assessment of the likelihood of resulting prejudice. *Id.* at 1020-21. If the court determines that no risk of substantial prejudice exists, it need not investigate further. *Id.* at 1021. Conversely, if the trial court finds the risk of prejudice is substantial, as opposed to imaginary or remote, it should interrogate the jury collectively to determine who, if anyone, has been exposed, and then individually interrogate any such jurors away from the others. *Id.* If the court discovers any degree of exposure and the likely effect thereof, it must take appropriate action, including at least a collective admonishment. *Id.* At all stages in this process, the trial court has the discretion to take whatever actions it deems necessary and appropriate. *Id.*

[55] In denying Pugh's motions, the trial court stated that the behavior and reactions of a defendant in the courtroom are, naturally, observable by the jury and noted that Pugh had been "reacting visibly to the evidence" by "[s]haking his head, rolling his eyes, [and] hanging his head." Tr. p. 1145. The court determined there was no need to question the jurors about the drawings because they would

be charged by the court in final instructions to arrive at a unanimous verdict based on the evidence. The court stated, "I don't believe we've risen to the level where I think that the jurors are indicating that they can't evaluate the evidence fairly and carefully." *Id.* at 1148.

[56]　While our courts have a duty to ensure an impartial jury, they are not obligated "to ensure the absence of *any* bias." *Caruthers*, 926 N.E.2d at 1021. Indeed, our Supreme Court has long maintained that "'jurors need not be absolutely insulated from all extraneous influences regarding the case and that such exposure, without a showing of influence, will not require a new trial.'" *Id.* (citing *Lindsey v. State,* 260 Ind. 351, 357, 295 N.E.2d 819, 823 (1973)). Although Pugh characterizes the situation as juror exposure to outside influences, such is not the case. Rather, this is simply a situation of juror observations of a defendant's behavior during trial. Nevertheless, the trial court made a threshold assessment and determined there was little likelihood of resulting prejudice. Nothing more was required. *See, e.g.*, *Caruthers*, 926 N.E.2d at 1020-22 (no fundamental error where trial court did not interrogate jury for bias after taking additional security measures to address unspecified juror concerns). Pugh has failed to establish that he was placed in a position of grave peril to which he should not have been subjected such that the trial court abused its discretion in denying his motion for a mistrial.

# Conclusion

For the reasons stated, we conclude that the trial court did not err by admitting evidence obtained as a result of the seizure of Pugh and that there was sufficient evidence to support Pugh's convictions of rape, attempted criminal deviate conduct, and carjacking as an accomplice. In addition, the single larceny rule is not violated by Pugh's three robbery convictions, and the continuing crime doctrine does not apply to his convictions of two counts of rape. Finally, we conclude that the trial court did not err in denying Pugh's motion for a mistrial.

Affirmed.

Barnes, J., and Altice, J., concur.