## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 25 2017, 7:54 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David K. Payne
Braje, Nelson & Janes, LLP
Michigan City, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela Sanchez
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Steven Lindsey,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 25, 2017<br><br>Court of Appeals Case No.<br>64A04-1703-CR-482<br><br>Appeal from the<br>Porter Superior Court<br><br>The Honorable<br>William E. Alexa, Judge<br><br>Trial Court Cause No.<br>64D02-1502-MR-1173 |

**Kirsch, Judge.**

[1]     Steven Lindsey ("Lindsey") was convicted after a jury trial of murder,[1] a felony, and was sentenced to fifty-five years executed. Lindsey raises seven issues for our review, which we restate as:

> I.      Whether the trial court abused its discretion when it denied Lindsey's request for a continuance in the middle of trial where the State sought to introduce new evidence that Lindsey's boots matched a footprint found outside the house;

> II.     Whether the trial court committed fundamental error when it did not further question a juror about her decision to remain on the jury when it was evident that the length of the trial would conflict with her vacation plans;

> III.    Whether the trial court abused its discretion when it admitted evidence that blood found on the wall of the crime scene belonged to Lindsey;

> IV.     Whether the trial court abused its discretion when it excluded videos of police interviews that Lindsey claimed showed the lack of investigation by the police and, therefore, denied him the right to present a complete defense;

> V.      Whether the trial court abused its discretion when it denied Lindsey's request to allow him to read his prior testimony into the record when the testimony was offered by the State in its case-in-chief;

---

[1] *See* Ind. Code § 35-42-1-1.

VI.   Whether the trial court erred when it declared a mistrial when new evidence was discovered by the State during Lindsey's first trial; and

VII.  Whether the trial court abused its discretion when it admitted evidence that Lindsey had the victim's dog euthanized shortly after her murder.

We affirm.

## Facts and Procedural History

In early 2012, Lindsey met his future wife, Melinda, and within a couple of months, she became unexpectedly pregnant with his child. Melinda had been an exotic dancer when the two met, but, after becoming pregnant, she quit her job and did not return to work again. Lindsey did not like Melinda associating with her friends or former customers from her time as a dancer, and Melinda had less and less contact with her friends as well as her family after her relationship with Lindsey began.

Lindsey was working as an electrical lineman when he and Melinda met, but he was fired from his job in early 2014 for drinking on the job. Lindsey worked sporadically until November 2014, earning substantially less than he had in prior years. After November 2014, Lindsey did not work again until after Melinda was murdered in January 2015. In October 2014, Lindsey's behavior became very impulsive and unpredictable. He opened a new credit card and purchased a cruise, but never made a payment on the credit card. Lindsey also cashed out over $16,000 from his retirement account and spent all of that

money within weeks. In November 2014, he was ordered to pay $6,200 in child support arrears. During this time, Lindsey had stopped paying his rent and numerous other bills. From May 2014 to January 2015, bank accounts belonging to Lindsey and Melinda were frequently overdrawn and numerous payments were returned for insufficient funds.

[5] One of the payments returned for insufficient funds was the December 2014 premium for a life insurance policy with MetLife insuring Melinda's life. The policy had been issued in January 2014 and insured Melinda's life for one million dollars with an additional accidental death benefit of $100,000. Lindsey was the sole beneficiary. On January 7, 2015, MetLife sent a letter to Lindsey and Melinda stating that their premium had not been paid and that if they did not pay by January 26, 2015, the policy would be cancelled.

[6] The couple frequently fought about their financial problems. Melinda wanted Lindsey to return to work, and she also discussed returning to work as a dancer to earn extra money, but Lindsey did not want her to do so. Melinda asked her parents if she and her daughter could move back in with them in Illinois. Although Melinda was not actually pregnant at the time of her death, Lindsey believed that she was pregnant in December 2014. Lindsey and Melinda had a big fight around January 1, 2015, and Melinda told Lindsey that she was leaving him. She went to a friend's house, in a hysterical state, and said that Lindsey had taken their daughter to his brother's house and would not let Melinda have her daughter. *Tr. Vol. VII* at 1595.

[7] On January 8, 2015, Lindsey called police to report that he and Melinda had returned home and discovered the screen to their bedroom window had been cut and the window was open. No one had gained entry into the house, and the couple's three dogs—a large Malamute that had belonged to Lindsey before marriage and an aggressive and protective pit bull mix and a small Chihuahua that had both belonged to Melinda before the marriage—were inside the house. When police arrived at the scene, the bedroom window was closed. Lindsey told police that he believed someone opened the window to lure the dogs out so that they could enter the house. *Tr. Vol. II* at 337.

[8] On January 15, a detective called to follow up on the January 8 incident, and while Melinda was on the phone with the officer, Lindsey informed Melinda that he had just discovered suspicious footprints around their house. *Tr. Vol. VIII* at 1865-66. Officers came to the house that day to investigate but observed that the prints did not appear fresh. Later the same day, Melinda called police again to report that she had noticed that several items were missing from her car. Lindsey and Melinda suggested that these incidents, and another unreported incident months earlier, might be related to stalking and suggested several ex-boyfriends and former customers, from when Melinda was a dancer, as possible suspects.

[9] The next morning, on January 16, shortly before 6:30 a.m., Melinda was shot in the head while in bed. The bullet entered above and behind her left ear, travelled through her skull, and exited above and in front of her right ear. There was stippling around the entry wound which indicated that she was shot

at close range. There were no signs of a struggle or sexual assault, and a blanket was pulled up over Melinda's body, with her arms resting down at her side. Melinda later died of her wounds at the hospital. It was later determined that she had been shot with a single bullet from her own gun, which was left on the floor of the bedroom with no other bullets in it.

[10] Meanwhile, Lindsey had called 911 at approximately 6:20 a.m. and screamed incoherently for approximately two minutes before hanging up. After receiving the call, the dispatcher searched the system for records associated with the phone number and dispatched police to the couple's address immediately. The dispatcher then attempted to contact Lindsey via text or call, but did not get an answer. After initially calling 911, Lindsey had called his brother, and after speaking with his brother for almost a minute, Lindsey called 911 back, approximately six minutes after the first call, and reported either "My wife's been shot" or "They shot my wife." *Tr. Vol.* at 330-32. Police arrived at the home while Lindsey was still on the phone with 911.

[11] Police entered the house through the unlocked front door and could still smell burnt gun powder in the air, which suggested that it had only been fifteen to twenty minutes since the gun had been fired. *Tr. Vol. II* at 496-97. Melinda was in her bed and still alive. The dogs were in the garage, although Lindsey claimed that they were in the house when he went to sleep and were never kept in the garage. *Tr. Vol. III* at 550; *Tr. Vol. XI* at 2664. The police discovered Lindsay in his daughter's bedroom. Lindsey told the officers that he could not open the door, and when the officer entered, Lindsey was on his knees in front

of his daughter's crib with his hands restrained behind his back with two large, white zip ties. The officer found zip ties of the same kind in the bedroom where Melinda was discovered. During the investigation, it was learned that the brand of zip ties was exclusively sold in bulk through electrical supply distributors and were accessible to Lindsey where he worked. *Tr. Vol. IX* at 2046-52, 2203-08.

[12] Lindsey informed the police that he had fallen asleep on the sofa watching television around 2:00 a.m. and woke up when someone began choking him from behind. *Tr. Vol. III* at 537. Lindsey maintained that he blacked out almost immediately and could not remember anything until he woke up on the floor of his daughter's bedroom to the sound of what he thought was a gunshot. *Id*. He claimed that his hands had already been zip-tied when he woke up, but he did not remember anything about how he had gotten to his daughter's room. *Tr. Vol. XI* at 2663-64. Lindsey advised the police of the same list of possible suspects for Melinda's murder as he had provided for the prior incidents. The police investigated these suspects and eliminated them all because they had verified alibis. *Tr. Vol. III* at 690. There were no signs of forced entry to the home; the front door was unlocked when the police arrived, although Lindsey stated it was locked when he went to bed, and Melinda was known to always lock doors. All other doors to the house were closed and secured, and no footprints were found outside leading to any other point of entry.

[13] Shortly after Melinda died, Lindsey had her body cremated, which was against her family's wishes, and did not hold a memorial service or publish an obituary.

Within several weeks of Melinda's death, Lindsey took numerous rings, including an engagement ring, and other jewelry to a jewelry store to attempt to sell, but the store did not purchase any of the items. Lindsey made several calls to MetLife to initiate a claim on Melinda's policy and to check on the status of the claim. He took Melinda's two dogs to a veterinarian clinic and had them euthanized. Lindsey was arrested and charged with Melinda's murder on February 12, 2015.

[14] Lindsey's first trial began on September 21, 2015. At the end of the first day of trial, after the jury was selected and sworn, but before any evidence was presented, the State was informed that a woman had reported to police that day that another man, a former boyfriend of Melinda's named Michael Manning ("Manning"), had confessed to her that he had committed the murder. The State informed defense counsel immediately, and the parties jointly requested a continuance of trial the following morning to permit further investigation. The trial court adjourned the trial for two days to permit further investigation. In investigating the allegations, the police conducted multiple taped interviews with several witnesses, conducted a voice stress test with Manning, and executed a search warrant to obtain cell phone location data for Manning. Prior to the day that the trial was set to resume, Linsey filed a "motion for continuance and/or additional time," in which he maintained that it was "physically impossible" for defense counsel to review and investigate the volume of recently obtained information before the trial was scheduled to resume and that to proceed without additional time would deprive him of due

process, and he requested that "trial either be continued or reset for an adequate period of time to allow [Lindsey's] counsel to conduct his due diligence regarding this recent information." *Appellant's App. Vol. II* at 75-80.

[15] On the day the trial was set to resume, the trial court met with the parties and informed them that, after doing extensive legal research and considering Lindsey's right to due process and the volume of new evidence, it had decided to declare a mistrial. The trial court stated that it was ordering the mistrial to protect the rights of the defendant. Before bringing the jury back in, the trial court inquired as to both parties if they had any additional issues to discuss, and Lindsey raised only the question of whether the trial court would set bond. Lindsey did not object or otherwise protest the trial court's decision to declare a mistrial. The jury was returned to the courtroom, thanked, and discharged.

[16] A jury trial again commenced on November 2, 2015, but that trial resulted in another mistrial due to a hung jury. A third jury trial commenced on February 16, 2016. During voir dire, Juror 7 informed the court that she was scheduled to leave town to attend a wedding on Thursday, March 10, 2016, but that she could delay her flight if necessary and still attend the wedding. *Tr. Vol. II* at 265-66. When she was asked if this would upset her, she replied "maybe a little." *Id*. at 266. However, she assured the trial court that she would not allow this to rush her to a quick verdict. *Id*.

[17] As the trial continued and March 10 drew near, the trial court reminded the parties of Juror 7's travel plans and asked them to consider how they wanted to

address the issue. The trial court noted that there were two alternate jurors and requested that the parties consider whether they wanted to excuse Juror 7. *Tr. Vol. X* at 2316-17. When it became clear that the trial would not conclude by March 10, the trial court brought Juror 7 into court and inquired if she wished to be excused from the jury or stay until the trial was completed. *Id.* at 2411. Juror 7 stated that she would rather stay, and Lindsey declined the opportunity to further question the juror. *Id.* at 2411-12.

[18] Prior to the presentation of evidence, Lindsey had advised the trial court that if the State intended to read the transcript of Lindsey's testimony from his previous trial into evidence, he wanted to be allowed to be the one who read the testimony to prevent another reader from adding their own inflections to the testimony. *Tr. Vol. II* at 291. The State argued that it should be allowed to have its choice of reader to present evidence in its case-in-chief and that the jury could be confused by having Lindsey read the prior testimony. *Id.* The trial court agreed with the State and said it did not think it appropriate to allow Lindsey to read the testimony. *Id.* Later in the trial before the prior testimony was read, Lindsey raised several objections to it but did not renew his request to read his testimony into evidence. *Tr. Vol.* at 2126-27. The State had a detective who had not been involved with the investigation read Lindsey's prior testimony to avoid any risk of undue influence or inappropriate inflections added to the testimony. *Id.* at 2128. Before the detective read the testimony, the trial court admonished him to read the words in the transcript without added inflections, and the detective agreed. *Id.* at 2196.

[19]     During the investigation of the crime scene, a number of spots of blood were located on the wall near the headboard of the bed where Melinda was shot, and DNA tests later revealed that the blood belonged to Lindsey. Testimony was presented that the shape, location, and other characteristics of the blood spatter was inconsistent with having come from Melinda's fatal wound. Lindsey objected and contended that the stains were irrelevant and unduly prejudicial. He alleged that the blood could not have been placed on the wall at the time of the murder because he had no visible injuries on his body at the time that police photographed him after the murder. *Tr. Vol. V* at 1130-32. The trial court overruled the objection.

[20]     The State also sought to admit evidence that Lindsey had euthanized Melinda's dogs shortly after her murder. Lindsey objected to the evidence on the basis that it was irrelevant and unduly prejudicial, arguing that it was merely designed to elicit sympathy from any dog lovers on the jury. *Tr. Vol. VIII* at 1844-45. The State responded that the evidence was relevant for two reasons: first, the vet records contained notes about the aggressive nature of the pit bull mix that undermined Lindsey's claim that an intruder had entered the house without being attacked by the dog or causing it to bark and wake either Melinda or Lindsey; and second, Lindsey's decision to have both of Melinda's dogs euthanized so soon after her death along with other evidence showed a pattern of behavior that was inconsistent with that of a grieving widower and suggested that he was trying to rid his life of all traces of Melinda. *Id.* at 1844, 1846. The trial court overruled Lindsey's objection.

During his case, Lindsey sought to admit and play for the jury numerous videos of interviews that police conducted after they were alerted to the claim that Manning had confessed to killing Melinda. In their investigation of that claim, the police interviewed Manning, his father, his ex-wife, and the woman who had approached the police. Lindsey acknowledged that the interviews were "on face hearsay," but claimed that he was not offering them for the truth of the matter asserted. *Tr. Vol. XI* at 2587. Instead, he asserted that allowing the jury to watch the videos would show that the police had not seriously investigated Manning's alleged confession. *Id*. In support of this argument, Lindsey cited only the example of one officer, in one video, who allegedly stated, "'[c]ome on, just tell us anything, we want to get out of here,'" to show the probative value of the content of the lengthy videos. *Id*. at 2587. At that time, Manning, his father, and his ex-wife had already testified during the trial. The trial court excluded the videos after noting that Lindsey had the opportunity to present evidence regarding the police investigation and the interviews through other witnesses. *Id*. at 2588.

On the morning of the murder, the police had noticed a boot print with a distinctive tread pattern by the front porch of the house and had photographed it. During the trial, a detective testified that he believed that they compared the print to the tread patterns of all the boots in Lindsey's home, and none had matched the print. The detective had also gone to various stores to see if he could locate a boot with a similar tread pattern, but was not able to locate any. However, after his initial testimony and while the trial was still occurring, the

detective decided to double check that he had compared the treads on all of Lindsey's boots to the print. He discovered that the print did match the tread pattern of a pair of boots from the home; the matching boots had not been collected into evidence at the house with the other boots, but had been given to Lindsey to wear on the morning of the crime because he had exited the house barefoot. *Tr. Vol. X* at 2277. The boots were later collected from Lindsey with his other clothing when he was interviewed at the police station.

[23] When the State was informed of this discovery, the prosecutor informed defense counsel, who sought to have the detective's testimony excluded. The trial court allowed Lindsey to question the detective about his discovery outside the presence of the jury, and after this questioning, Lindsey renewed his request to exclude the evidence, claiming that he did not have adequate time to investigate it. The trial court denied the request to exclude. Before the witness testified, Lindsey requested a continuance to allow for examination of the evidence and to preserve the issue for appeal, and the trial court denied the request.

[24] At the conclusion of the jury trial, Lindsey was found guilty of murder. He was later sentenced to fifty-five years in the Indiana Department of Correction. Lindsey now appeals his conviction.

# Discussion and Decision

## I.   Denial of Continuance

[25]   Lindsey argues that the trial court abused its discretion when it denied his motion for a continuance.  The trial court has broad discretion in dealing with a discovery violation by the State in the alleged late disclosure of evidence to the defense.  *Kennedy v. State,* 934 N.E.2d 779, 784 (Ind. Ct. App. 2010) (citing *Berry v. State,* 715 N.E.2d 864, 866 (Ind. 1999)).  We will reverse the trial court's ruling in such matters only for an abuse of discretion involving clear error and resulting prejudice.  *Berry,* 715 N.E.2d at 866.  The proper remedy for a discovery violation is generally a continuance.  *Id.*  "Exclusion of the evidence is an extreme remedy and is to be used only if the State's actions were deliberate and the conduct prevented a fair trial."  *Id.*  Failure to alternatively request a continuance upon moving to exclude evidence, where a continuance may be an appropriate remedy, constitutes a waiver of any alleged error based on noncompliance with the court's discovery order.  *Warren v. State,* 725 N.E.2d 828, 832 (Ind. 2000).

[26]   Lindsey contends that the trial court abused its discretion when it denied his request for a continuance where the State disclosed new evidence in the middle of the trial.  He asserts that the trial court allowed him an inadequate amount of time in which to investigate and prepare for the new evidence.  Lindsey argues that, even though the officer who testified to the new evidence was not a new witness, his testimony regarding the boot print was not anticipated, and Lindsey required more time to properly investigate it.  Lindsey further claims

that the trial court's statement that the new evidence "[didn't] go to admissibility but [to] the weight that a jury is going to give to it" was erroneous and did not afford him a sufficient remedy for the State's newly-revealed evidence. *Tr. Vol. X* at 2274.

[27]    During the trial, a detective, testifying about the boot print with the distinctive tread pattern found outside the house the morning of the murder, stated that he believed they compared the print to the tread patterns of all the boots in the home and had not found any that matched. The detective also went to various stores to try to locate a boot with a similar tread pattern, but was not able to do so. However, after his initial testimony, and while the trial was still ongoing, the detective decided to double check the treads on the boots from Lindsey's house and discovered that the print did match the tread pattern of a pair of boots from the home. The matching boots had not been collected into evidence at the house with the other boots, but had been given to Lindsey to wear on the morning of the crime and were later collected from Lindsey with his other clothing when he was interviewed at the police station. The State informed defense counsel of this discovery when the State was made aware of the match. The trial court allowed Lindsey to question the detective about his discovery outside the presence of the jury, and after this questioning, Lindsey renewed his objection to the evidence, arguing that he did not have adequate time to investigate it. Before the witness testified, Lindsey requested a continuance to allow for examination of the evidence and to preserve the issue for appeal.

[28]     Prior to the challenged testimony by the detective, a picture of the boot print had been admitted into evidence and the detective had testified about the print's distinctive tread pattern, where it had been found, and his efforts to try to match the print to boots from the house. Testimony was also presented that the police had given Lindsey a pair of boots to wear to the police station. Therefore, the only new evidence was that the tread pattern of the boots Lindsey wore to the police station matched the boot print. The challenged testimony consisted of the detective stating that he looked at the tread patterns of the boot taken from Lindsey at the police station and looked at the photograph of the boot print and noticed that the tread patterns were the same. *Tr. Vol. X* at 2277-79. The detective noted that unique markings of the boot print found outside the house matched the tread patterns of the boots taken from Lindsey. *Id*. Although Lindsey alleges that he did not have time to investigate the comparison, at trial, he did not inform the trial court of what specific analyses or consultations he believed were necessary and that he needed additional time to perform. Instead, he only mentioned having "questions" about the size of the print and the shoe. *Id*. at 2273. Lindsey "must make a specific showing that the additional time requested would have aided him in order to show an abuse of discretion on the part of the trial court." *Clark v. State,* 539 N.E.2d 9, 11 (Ind. 1989). Because nothing in the record suggests that a continuance would have further aided Lindsey, we find that the trial court did not abuse its discretion when it denied Lindsey's request for a continuance.

[29] We further find that the present case is distinguishable from *Johnson v. State*, 384 N.E.2d 1035 (Ind. Ct. App. 1979), on which Lindsey relies. In *Johnson*, a firearms expert was first identified the day before trial and called to testify to technical issues that concerned the central claim in the case, whether the gun had fired intentionally or accidentally. The trial court denied Johnson's request for a continuance, instead only allowing for a midtrial deposition. This court found that the midtrial deposition did not provide the defendant adequate time to prepare for the witness. *Id*. at 35-36.

[30] Here, the detective's testimony did not present any similar issues to *Johnson.* The challenged testimony in the present case did not involve a highly technical subject, and Lindsey never suggested he wanted to consult an expert to rebut the testimony. Most importantly, whether the boot print belonged to Lindsey or a third party was not central to the question of Lindsey's guilt. The evidence merely eliminated the possibility that it belonged to a third-party intruder, but this is unavailing as Lindsey did not contend the intruders entered through the front door; he believed they entered through a faulty garage door. The trial court did not abuse its discretion in denying Lindsey's request for a continuance.

## II. Juror Inquiry

[31] Lindsey contends that the trial court erred in not questioning Juror 7 more extensively when the juror decided to remain on the jury. Lindsey asserts that the trial court had a duty to determine the level of potential prejudice held by

Juror 7, which was a separate inquiry from whether the juror wished to stay on the jury for the conclusion of the trial. Lindsey argues that Juror 7's response that she would remain on the jury did not reveal if she held any prejudice based on having to postpone her travel plans and that the trial court should have made a further inquiry in light of her earlier statement that she may be upset if her trip was interrupted. Lindsay also takes issue with the phrase "the bitter end" used by the trial court and claims that Juror 7's response to the phrase could indicate the "distastefulness and unpleasantness of her sacrifice with regard to the travel plans." *Appellant's Br.* at 24.

[32] During voir dire, Juror 7 informed the court that she had plans to attend an out of town wedding on March 10, 2016, but that she could delay her flight if necessary and still attend the wedding. *Tr. Vol. II* at 265-66. When asked if this would upset her, she replied "maybe a little," but assured the trial court that she would not allow it to cause her to reach a quick verdict. *Id*. As the trial continued and March 10 drew near, the trial court reminded the parties of Juror 7's travel plans, noted that there were two alternate jurors, and requested that the parties consider whether they wanted to excuse Juror 7. *Tr. Vol. X* at 2316-17. When it became clear that the trial would not be completed by March 10, the trial court brought Juror 7 into court and inquired if she wished to be excused from the jury or stay until "the bitter end." *Id*. at 2411. Juror 7 stated that she would rather stay, and Lindsey declined the opportunity to further question the juror. *Id*. at 2411-12.

[33] A claim of error must be raised during trial in order to be available as an issue on appeal, and the failure to raise such a claim generally waives that issue for appeal. *Clark v. State*, 915 N.E.2d 126, 131 (Ind. 2009). "We nevertheless sometimes entertain such claims under the rubric of 'fundamental error.'" *Caruthers v. State*, 926 N.E.2d 1016, 1020 (Ind. 2010). Fundamental error is an error that makes a fair trial impossible or constitutes clearly blatant violations of basic and elementary principles of due process presenting an undeniable and substantial potential for harm. *Id.*

[34] Lindsey argues that the trial court failed to inquire as to any potential bias or prejudice held by Juror 7, which denied him his right to a fair trial. The right to a fair trial before an impartial jury is a cornerstone of our criminal justice system. *Whiting v. State*, 969 N.E.2d 24, 28 (Ind. 2012) (citations omitted). It requires that a criminal defendant be given "a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722 (1961). A constitutionally impartial juror is one who is able and willing to lay aside his or her prior knowledge and opinions, follow the law as instructed by the trial judge, and render a verdict based solely on the evidence presented in court. *Whiting*, 969 N.E.2d at 28 (citing *Irwin*, 366 U.S. at 722-23). "While courts have a duty to ensure an impartial jury, we have never held that they have the obligation to ensure the absence of *any* bias." *Caruthers*, 926 N.E.2d at 1021 (emphasis in original). If a trial court determines that there is no risk of substantial prejudice, it has no duty to investigate further into potential juror bias. *Id.*

[35]  In *Caruthers*, 926 N.E.2d 1016, which Lindsay cites to in support of his argument, our Supreme Court held that the determination of whether the trial court should have proceeded with questioning jurors turned on whether the trial judge could have reasonably concluded that there was little likelihood of actual prejudice. *Id*. at 1021. Here, the trial court asked Juror 7 how she wanted to proceed when it became apparent that the trial would not conclude before March 10 and would impede her travel plans and even offered Juror 7 the opportunity to be released from the jury completely. Taking into account that Juror 7's only stated minor concern during voir dire was about the disruption of her trip, it was reasonable for the trial court to conclude there was no actual bias on the part of Juror 7. When given the opportunity to be released from the jury, Juror 7 stated she would rather stay due to the amount of time already invested in the trial. We conclude that it was reasonable for the trial court to believe there was no substantial risk of bias in light of Juror 7's decision to stay on the jury. Further, just because the trial court used the phrase "the bitter end" when inquiring as to whether Juror 7 wished to remain on the jury until the completion of the trial does not imply bias. These were not words used by Juror 7, and the phrase is a common expression; it is not likely that Juror 7 interpreted this phrase as the trial court expressing a sincere opinion on the experience of remaining on the jury. Lindsey has not shown that fundamental error occurred.

# III. Blood Evidence

[36] Lindsey contends that the trial court abused its discretion when it admitted evidence of blood spots found on the wall near where Melinda was shot that belonged to him. "Questions regarding the admission of evidence are entrusted to the sound discretion of the trial court." *Harrison v. State*, 32 N.E.3d 240, 250 (Ind. Ct. App. 2015), *trans. denied*. Accordingly, we review the trial court's decision on appeal only for an abuse of that discretion. *Id.* The trial court abuses its discretion only if its decision regarding the admission of evidence is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id.* We do not reweigh the evidence, and we consider conflicting evidence in a light most favorable to the trial court's ruling, but we also consider any undisputed evidence that is favorable to the defendant. *Id.*

[37] During the trial, the State sought to admit evidence that a number of spots of blood were found on the wall near the headboard of the bed where Melinda was shot, and DNA tests revealed that the blood belonged to Lindsey. Testimony was presented that the shape, location, and other characteristics of the blood spatter was inconsistent with having come from Melinda's fatal wound.

[38] Lindsey argues that it was an abuse of discretion for the trial court to admit the blood evidence attributed to him that was discovered on the wall near where Melinda was shot. Lindsey asserts that, because he had no injuries at the time he was interviewed by the police that were capable of producing such blood

spatter, the blood must have been from an unrelated incident and was, therefore, not relevant as to whether he murdered Melinda. Lindsey also contends that allowing such evidence to be admitted was highly prejudicial because it invited the jury to speculate as to how the blood ended up on the wall.

[39] However, the presence of the blood spatter on the wall above the headboard of the bed in which Melinda was shot was relevant to the investigation. In fact, prior to trial, Lindsey moved to compel testing of the blood stains, and during his first trial, he questioned officers extensively about why the blood had not yet been tested; therefore, it seems that Lindsey believed that establishing the source of the blood was important. This blood evidence was relevant in establishing that the blood was not placed there by some unknown perpetrator and to eliminate other possible suspects and refute Lindsey's claim that an unidentified intruder killed Melinda. It was also relevant to establish that the blood did not come from Melinda's fatal wound and assist in describing the crime scene to the jury. The evidence was relevant to demonstrate that the police thoroughly examined the crime scene and determined the source of the blood since Lindsey challenged the thoroughness of the investigation in this case. Additionally, Lindsey contends that it was impossible for his blood to have been placed on the wall at or near the time of the crime because he had no obvious open wounds when he was photographed by police the morning after the crime. However, even if there was no fresh and obvious open wound, there are other ways that a person's blood could have gotten on the wall, such as

bleeding from the nose or mouth with no visible injuries or bleeding from relatively small wounds such as nicks from a razor that could go unnoticed. Further, contrary to Lindsey's contention on appeal, it was not necessary for the State to prove how the blood got on the wall. The trial court noted that any dispute about when or how the blood was placed on the wall was for the jury to resolve, and Lindsey's concerns were best addressed through cross-examination of the witness, which Lindsey had an opportunity to do. *Tr. Vol. V* at 1130-31. We conclude that the trial court was within its discretion to admit the evidence pertaining to the blood spatter.

## IV. Failure to Admit Interview Videos

[40] Lindsey claims that the trial court abused its discretion when it did not allow him to admit the video-recorded interviews of individuals that suggested a third-party committed the murder. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Barnhart v. State*, 15 N.E.3d 138, 143 (Ind. Ct. App. 2014) (citing *Hardiman v. State,* 726 N.E.2d 1201, 1203 (Ind. 2000)). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances presented. *Id.* However, errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party. *Id.* (citing *Fleener v. State,* 656 N.E.2d 1140, 1141 (Ind. 1995)). We, therefore, "will find an error in the exclusion of evidence harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect

the defendant's substantial rights." *Id.* (citing *Williams v. State,* 714 N.E.2d 644, 652 (Ind. 1999), *cert. denied,* 528 U.S. 1170 (2000)).

[41] Lindsey argues that the trial court's failure to admit the video-recorded interviews that were related to the confession of a third party was an abuse of discretion. He asserts that the videos should have been admitted into evidence because they were relevant to his defense that the police did not conduct a thorough investigation and failed to follow up on other suspects. Lindsey argues that the videos were admissible because they were not hearsay since he sought to admit them for a purpose other than the truth of the statements contained in the videos, which was to demonstrate that the police did not conduct a proper investigation. He further contends that the trial court's failure to admit the videos denied him his constitutional right to present a complete defense under the United States Constitution.

[42] Lindsey sought to admit and play for the jury numerous videos of interviews that police conducted after the police had been made aware of the claim that Manning had confessed to killing Melinda. In investigating that claim, the police interviewed Manning, his father, his ex-wife, and the woman who approached the police. Lindsey acknowledged to the trial court that the interviews were "on face hearsay," but claimed that he was not offering them for the truth of the matter asserted and argued that the videos would show that the police had not seriously investigated Manning's alleged confession. *Tr. Vol. XI* at 2587. In support of this argument, Lindsey cited only the example of one officer, in one video, who allegedly stated, "'[c]ome on, just tell us anything, we

want to get out of here,'" to show the probative value of the content of the lengthy videos. *Id*. at 2587.

[43] When the admissibility of an out-of-court statement is challenged as hearsay, we first determine whether the testimony describes an out-of-court statement that asserts a fact susceptible of being true or false. *Vertner v. State*, 793 N.E.2d 1148, 1151 (Ind. Ct. App. 2003). If the statement does contain an assertion of fact, we consider the evidentiary purpose of the proffered statement. *Id*. If the statement is offered for a purpose other than to prove the truth of the matter asserted, we consider whether the fact to be proved is relevant to some issue in the case and whether the danger of unfair prejudice that may result from its admission outweighs its probative value. *Id.* Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ind. Evidence Rule 401.

[44] We agree that Lindsey's stated purpose of challenging the thoroughness of the police investigation into the claim that someone else confessed to the murder is relevant. However, Lindsey has not shown how the excluded videos would have established that the police did not conduct a thorough investigation into another possible suspect. At trial, Lindsey only pointed to a single instance on one of the several videos he sought to admit in support of his claim that the police did not seriously investigate the claim that a third party committed the murder. Here, on appeal, he does not offer anything further regarding the content of the videos to support his claim. The videos contained almost nine

hours of interviews, with numerous police officers interviewing four different individuals concerning the allegations that Manning confessed to the murder of Melinda. Further, at the point at which Lindsey attempted to have the videos admitted into evidence, Manning, his father, and his ex-wife had already testified during the trial, and Lindsey had the opportunity to challenge the police investigation when cross-examining each of the police officers who testified. Although Lindsey offered a relevant non-hearsay purpose for the admission of the evidence, he did not prove that the contents of the videos had a strong tendency to support his stated purpose. We therefore conclude that Lindsey failed to establish that the video evidence was relevant and had high probative value. The trial court did not abuse its discretion excluding the videos from being admitted at trial.

[45] Lindsey argues that the trial court's exclusion of the videos violated his right to present a defense under the United States Constitution. The Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Crane v. Kentucky,* 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984)). An essential component of procedural fairness is an opportunity to be heard. *Id*. However, the right to present a defense is not absolute. *Schermerhorn v. State*, 61 N.E.3d 375, 379 (Ind. Ct. App. 2016), *trans. denied*. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois,* 484 U.S. 400, 410 (1988). Evidence must be relevant to be admissible. Evid. R. 402.

[46] Based on Lindsey's contentions and the evidence, he has not shown that the contents of the videos had a strong tendency to support his argument that the police did not conduct a complete investigation into a possible third-party suspect in the murder. The proposed video evidence consisted of many hours of interviews of multiple people, many of whom testified at trial. Lindsey also was able to cross-examine all of the officers who testified at trial regarding their investigation. We find that the proposed evidence was irrelevant pursuant to Indiana Evidence Rule 401 and, therefore, inadmissible under Evidence Rule 402. Lindsey's right to present a defense does not include a right to present evidence that does not comply with the evidentiary rules, and thus, the trial court did not violate his constitutional rights by not admitting the videos.

## V. Reading of the Transcript

[47] Lindsey argues that the trial court abused its discretion in refusing to allow him to read the transcript of his prior trial testimony into evidence at his third trial. He contends that his case turned on his credibility and the jury had to weigh the State's circumstantial case against his testimony that a third party had committed the crime. Lindsey asserts that the jury could not adequately perform this task with a detective reading a cold record into evidence and that the trial court denied his ability to provide the jury with proper demeanor evidence. He maintains that the trial court's decision allowed the State to present misleading and incomplete evidence at trial.

[48] At trial, the State requested permission, during its case-in-chief, to read into evidence the transcript of Lindsey's testimony from the prior trial. Lindsay

asked that he be allowed to be the one to read the testimony to prevent another reader from adding their own inflections to the testimony. The State argued that it should be allowed to have its choice of reader to present evidence in its case-in-chief and that the jury could be confused by having Lindsey read the prior testimony. The trial court agreed with the State and said it did not think it appropriate to allow Lindsey to read the testimony. Before the prior testimony was read, Lindsey raised several objections to it but did not renew his request to read his testimony into evidence. The State had a detective who had no previous involvement in the investigation read Lindsey's prior testimony, and the trial court admonished the detective to read the words in the transcript without added inflections.

[49]     We note that Lindsey does not provide a standard of review for this issue. However, "[a] trial court has wide discretion in managing the conduct of a trial in such a manner that facilitates the ascertainment of truth, insures fairness, and obtains economy of time and effort commensurate with the rights of both society and the defendant." *Roberts v. State*, 894 N.E.2d 1018, 1027 (Ind. Ct. App. 2008) (citing *Utley v. State*, 589 N.E.2d 232, 239 (Ind. 1992), *cert. denied*, 506 U.S. 1058 (1993)), *trans. denied*. The trial court's exercise of discretion will not be disturbed unless the defendant demonstrates that he or she was prejudiced by an abuse of that discretion. *Id*.

[50]     Lindsey does not argue on appeal that his prior testimony was inadmissible, and he does not raise any contention about the manner in which the testimony was actually read to the jury; his only argument is that he believes he should

have been the one to read the transcript. The trial court has discretion to determine how to conduct the trial and how Lindsey's prior testimony should be read into evidence, and its decision to allow a witness with no involvement in the investigation to read the transcript with no embellishments or added inflection was within its discretion. Additionally, Lindsey was not deprived of his right to have the jury assess the credibility of the witnesses as he asserts. He testified at trial, and the jury was able to observe his demeanor and assess his credibility at that time. Further, Lindsey has not shown how he was prejudiced by the trial court not allowing him to read the transcript into evidence. The State sought to admit this evidence during its case-in-chief and chose a detective who had not been involved in the investigation of the murder to read the testimony. Before the detective read the testimony, the trial court admonished him to read the words in the transcript without added inflections, and the detective agreed. We find that the trial court did not abuse its discretion in not allowing Lindsey to read the transcript of his prior testimony into evidence during the State's case-in-chief.

## VI.  Declaration of Mistrial

Lindsey asserts that the trial court erred because it declared a mistrial when new evidence was discovered during his first trial and then later retried him. He contends that the trial court's *sua sponte* declaration of mistrial and his later conviction violated the prohibition against double jeopardy under the Fifth Amendment to the United States Constitution. Lindsey argues that he did not consent to the mistrial, and instead, he requested that the trial be either

"continued or reset" as opposed to the jury being discharged. *Appellant's Br*. at 39. He further maintains that the mistrial was not justified by manifest necessity because the grant of a mistrial benefited the State, no alternative to mistrial had been considered, and the extreme remedy of mistrial was not justified because the jury could have been brought back to hear the case after an investigation into the new evidence was conducted.

[52] The Double Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *Benton v. Maryland,* 395 U.S. 784, 794 (1969). Once a jury is impaneled, jeopardy attaches, and a defendant is protected from being twice placed in jeopardy. *Brock v. State*, 955 N.E.2d 195, 199 (Ind. 2011), *cert. denied*, 566 U.S. 909 (2012). The constitutional protection against double jeopardy has several features. Here, because the first trial ended in a mistrial, we focus on the defendant's "valued right to have his trial completed by a particular tribunal," *Wade v. Hunter,* 336 U.S. 684, 689 (1949), which means that the defendant has a right to have his trial completed by the first jury impaneled to try him, *Oregon v. Kennedy,* 456 U.S. 667, 673 (1982). Although this right is valued, it "must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade,* 336 U.S. at 689. Thus, unlike a trial that has ended with a judgment on the merits, declaration of a mistrial does not automatically bar retrial. *Arizona v. Washington,* 434 U.S. 497, 505 (1978).

[53]     If the trial judge declares a mistrial over the defendant's objection, the defendant may be retried only if the government demonstrates that the mistrial was justified by a "manifest necessity" or that "the ends of public justice would otherwise be defeated." *Brock*, 955 N.E.2d at 200 (quoting *United States v. Perez,* 22 U.S. 579, 580 (1824)). However, if the defendant consents to the mistrial, then retrial is permitted as a matter of course, unless the defendant can prove that the government intentionally goaded him or her into consenting to the mistrial "to subvert the protections afforded by the Double Jeopardy Clause." *Id.* (quoting *Kennedy,* 456 U.S. at 676). Therefore, to determine if the State was permitted to retry Lindsey after his first trial ended in a mistrial, we must engage in a multi-step analysis. First, we consider whether Lindsey consented to the trial judge's declaration of a mistrial. If so, then we consider whether the government goaded him into consenting. If he did not consent to the mistrial, then we consider whether it was justified by a "manifest necessity."

[54]     Lindsey contends that he did not consent to the declaration of a mistrial. In determining whether a defendant has consented to a mistrial, the Indiana Supreme Court has adopted the approach of the Seventh Circuit and numerous other federal circuit courts, which have held that a defendant can "tacitly consent to the mistrial because he failed to raise a contemporaneous objection." *Id*. at 202-03 (citing *United States v. Buljubasic*, 808 F.2d 1260, 1265-66 (7th Cir. 1987) (numerous additional citations omitted), *cert. denied*, 484 U.S. 815 (1987)). The requirement of a contemporaneous objection "allows the

defendant to control the decision whether to go to the first jury or to forego that option and have a different jury decide his or her fate." *Id*. at 203.

[55] In the present case, when the State informed defense counsel of the new evidence, the parties jointly requested a continuance of trial to permit further investigation, and the trial court adjourned the trial for two days to permit further investigation. After this initial agreed continuance, Lindsey filed a "motion for continuance and/or additional time." *Appellant's App. Vol. II* at 75-80, in which he listed the large amount of new evidence that has been produced by police and noted that it was "physically impossible" to review and investigate all of the recently obtained information before the trial was set to resume and that to proceed without delay would deprive him of due process. *Id*. at 77-80. He requested that "trial either be continued or reset for an adequate period of time to allow Defendant's counsel to conduct his due diligence regarding this recent information." *Id*. at 80.

[56] In requesting either a continuance or that the trial be reset, Lindsey sought relief other than just a continuance, as it seems his request for a reset of the trial was a request to declare a mistrial and reset the case for a new trial. This conclusion is further bolstered by Lindsey's conduct when trial resumed after the continuance. The trial court informed the parties that it had considered Lindsey's right to due process and the large amount of information that Lindsey needed to investigate and decided that a further continuance of the trial would impinge on Lindsey's rights. The trial court also stated that it had conducted research on the consequences of jeopardy attaching in the case and determined

that it would declare a mistrial in order to protect Lindsey's rights. The parties and court then discussed rescheduling trial and chose a new start date for the trial. At no time during this discussion, did Lindsey raise any objection to the trial court's decision or voice any disagreement with the trial court's determination of the need for a mistrial. At that time, Lindsey's only concern was whether the court would set bond in the interim. Only after this discussion and the setting of a new trial date was the jury returned to court and excused from service. Lindsey had a sufficient opportunity to object if he wanted to do so, and he chose not to do so. We, therefore, conclude that Lindsey tacitly consented to the mistrial by failing to lodge an objection. *Cf. Brock*, 955 N.E.2d at 203-04 (holding that a defendant's failure to object will not be deemed to be consent if the trial court's declaration of a mistrial does not allow the defendant the opportunity to object prior to discharging the jury).

[57] Because Lindsey consented to the mistrial, he could be later retried without finding manifest necessity. However, we find that, even if he had not consented, a retrial would not have violated double jeopardy principles because manifest necessity existed. "'We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.'" *Brock*, 955 N.E.2d at 206 (quoting *Perez*, 22 U.S. at 580). A trial court has broad discretion in determining whether the totality of the circumstances shows that there is a manifest necessity for

declaring a mistrial, and the standard must be applied with attention to the particular problem confronting the trial court. *Id*. We review the trial court's decision for an abuse of discretion, and it will be affirmed if a high degree of necessity is found. *Id*. at 207.

[58] Here, the mistrial was not caused by prosecutorial error, and nothing suggested that the State wanted a do-over in order to present a stronger case. The trial court noted that the State had promptly provided the newly discovered evidence, once found, and although the evidence would potentially change the way the case was presented by both sides, the evidence was potentially exculpatory. Accordingly, it was Lindsey, not the State, who stood to benefit from its discovery, and there is no reason to conclude that the State wanted a new trial so that it could present a stronger case than it already had. Moreover, when the mistrial was declared, the State had not begun to present any evidence at all. Additionally, because the mistrial was declared so early, there was only a minimal burden on Lindsey to duplicate his efforts as the jury had only just been chosen, but no evidence had yet been presented. Further, the trial court made its decision to declare a mistrial after conducting legal research and taking sufficient time to consider the situation and the effect it had on Lindsey's rights.

[59] The necessity of the trial court's decision is examined "in light of the steps taken by the trial court to avoid a mistrial, including whether counsel had an opportunity to be heard, whether the trial court considered alternatives, and whether the trial court's decision came after adequate reflection." *Id*. We conclude that, based on the totality of the circumstances, the trial court was

well within its discretion to find there was a manifest necessity for a mistrial. Lindsey's later retrial was not barred by double jeopardy.

## VII. Admission of Veterinary Records

[60] Lindsey contends that the trial court abused its discretion in admitting veterinary records that showed his consent to euthanize Melinda's dogs. The decision to admit or exclude evidence is within the discretion of the trial court, and this decision is afforded great deference on appeal. *Bell v. State*, 29 N.E.3d 137, 141 (Ind. Ct. App. 2015), *trans. denied*. Accordingly, we review the trial court's decision for an abuse of this discretion, which occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before it, or if the court misinterprets the law. *Id.*

[61] Lindsey argues that it was an abuse of discretion for the trial court to admit into evidence veterinary records that showed his consent to euthanize Melinda's dogs. He claims that the records were not relevant, and the State's reasons for relevance were not supported by the evidence. Lindsey further asserts that the records were unduly prejudicial because the evidence was only admitted to appeal to the sympathies of members of the jury who happened to be dog lovers and to provoke "an instinct to punish." *Appellant's Br.* at 43.

[62] At the time of her death, Melinda owned two dogs, one of which was an aggressive guard dog, who would attack anyone who appeared to be fighting with or attacking Melinda, even in a playful manner. The dog barked aggressively at anyone who approached the house. However, despite this, there

was no evidence that the dog barked or attacked the intruder that Lindsey claimed entered the house and killed Melinda. Less than a month after Melinda died, Lindsey took both of her dogs to a veterinarian and had them euthanized.

[63] At trial, the State sought to admit the veterinary records showing that the dogs were euthanized, arguing the records were relevant for two reasons: (1) they supported that one of Melinda's dogs was an aggressive guard dog; and (2) the fact that the dogs were euthanized so soon after Melinda died indicated that Lindsey was attempting to rid himself of the things that Melinda loved. Lindsey took Melinda's dogs to their regular veterinarian to be euthanized, and the records contained a notation that one of the dogs needed to be muzzled during treatments and that the staff should be aware of potential biting. *Tr. Vol. VIII* at 1848; *State's Ex.* 270. This evidence showed that Melinda's dog was aggressive and bolstered the State's assertion that it was unlikely that an intruder entered the house and killed Melinda because her dog would have barked or attacked if any intruder had been present. Additionally, the records showed that Lindsey took Melinda's dogs to be euthanized within several weeks of her murder, which could demonstrate this was part of a pattern of behavior that was inconsistent with a grieving widower, including Lindsey's decision to cremate Melinda and hold no funeral services against her family's wishes, and suggested an indifference to his wife and his loss of her. We, therefore, conclude that the evidence was relevant.

[64] As to prejudice, "all evidence that is relevant to a criminal prosecution is inherently prejudicial, and thus the Evidence Rule 403 inquiry boils down to a balance of the probative value of the proffered evidence against the likely unfair prejudicial impact of that evidence." *Duvall v. State*, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012), *trans. denied*. We do not find that this evidence was unduly prejudicial, and the trial court did not abuse its discretion in admitting it.

[65] Affirmed.

[66] Najam, J., and Brown, J., concur.