FILED

Jan 12 2021, 8:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Denise L. Turner
DTurner Legal LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Irving Madden,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff,*

January 12, 2021

Court of Appeals Case No.
20A-CR-196

Appeal from the Marion Superior
Court

The Honorable Shatrese M.
Flowers, Judge

Trial Court Cause No.
49G02-1810-F2-37562

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Irving Madden was convicted of two counts of aggravated battery, Level 3 felonies; kidnapping, a Level 5 felony; and kidnapping for ransom and criminal confinement, Level 2 felonies. The trial court sentenced Madden to an aggregate of forty years. Madden appeals and raises two issues which we expand, reorder, and restate as: (1) whether there is sufficient evidence to support his kidnapping for ransom conviction; (2) whether his convictions violate the continuous crime doctrine; (3) whether the trial court abused its discretion by imposing consecutive sentences; and (4) whether his sentence is inappropriate in light of the nature of the offenses and his character. We conclude there is sufficient evidence to support Madden's kidnapping for ransom conviction but Madden's additional convictions for kidnapping and criminal confinement must be vacated. We also conclude that the trial court did not abuse its discretion by imposing consecutive sentences and Madden's sentence is not inappropriate. We affirm in part, reverse in part, and remand.

# Facts and Procedural History

[2] The facts most favorable to the verdicts are as follows. In October of 2018, A.C. was in a relationship with Quantavious Jones. Madden was a friend or relative of Jones. On October 23, Jones told A.C. he planned to send her something in the mail the next day; A.C. agreed to accept the package. The next day, Jones called A.C. and asked whether she had received the package.

A.C. said no and Jones said he was coming to pick her up. When Jones arrived, A.C. got in the car and the two discussed the package. Jones "told [A.C.] that [they] were going to go to the UPS man and see if he possibly had it or delivered it to the wrong address[.]" Transcript of Evidence, Volume 2 at 199. They located the UPS delivery driver and asked whether the package had been delivered. The UPS driver stated the package had been delivered. Jones asked the driver whether he had seen A.C. that day and he responded he had not.

[3] Jones then asked for A.C.'s phone. A.C. complied and Jones searched the phone. While driving, Jones called Madden and told him that A.C. lost the package and they were coming to Madden's house. When A.C. realized they were going to Madden's house, she became concerned and "realize[d] something's up[.]" Id. at 201. A.C. tried to get out of the car but Jones grabbed her shirt and held her, preventing her from getting out. When they arrived at Madden's house, Jones told A.C. to get out of the car, but she refused because she "didn't feel safe." Id. at 204. Madden came out to the car, grabbed A.C. by the shirt, pulled her from the car, and took her into the basement of the house. Jones went inside with Madden and A.C.

[4] When they got to the basement, Jones handcuffed A.C. to a pipe. A.C. tried to get out of the cuffs, eventually succeeded, and reached for a phone that was in front of her. Jones grabbed A.C. and began "choking [her] to the ground." Id. at 206. A.C. could not breathe and felt as if she were about to lose consciousness. Madden then brought out a chair and A.C. was handcuffed to

the chair in the kitchen/bar area of the basement. Madden and Jones began questioning A.C. about the package. Madden stood behind her while Jones stood in front of her. Madden then threw a pot of hot water on A.C.'s "back, right side[,]" and she later described the pain as "worse than ten." *Id.* at 208. Still handcuffed, A.C. fell to the ground and "tried to scoot away into a corner" as Madden began hitting her in the head with the pot. *Id.* Madden stomped on A.C.'s chest and face and then began punching her until Jones pulled Madden off of her.

[5] A.C. stood up and went into the bathroom alone and Jones closed the door. Once A.C. was in the bathroom, she was instructed to take off her clothes.[1] As she began to remove her clothes, Madden opened the bathroom door and threw more hot water on her. Madden instructed A.C. to get in the bathtub. She complied. The men turned the shower on and ran hot water over A.C. Madden then began kicking and hitting A.C., causing her to go in and out of consciousness. At some point while the three were in the bathroom, Jones used A.C.'s phone to call people and ask about the package.

[6] After Madden beat A.C. for several minutes, he and Jones took her back to the kitchen area and discussed what to do with her. Madden asked Jones "if he could shoot [A.C.] or kill [her,]" but Jones said to let her go. *Id.* at 213. Madden gave A.C. some clothes and she got dressed. A.C. recalled seeing

---

[1] A.C. was unable to recall whether Madden or Jones told her to take her clothes off. *Id.* at 209.

Madden with a gun in his hand while they were in the basement. The three of them went upstairs. Madden left to put gas in the car and Jones and A.C. went to the kitchen where Jones gave her something to drink. Jones and A.C. then went to the garage because A.C. was "burning" and "wanted [ ] cool air." *Id.* at 214. Jones allowed A.C. to call her family and specifically told her she needed to tell her family to give them $3,000 to let her go. A.C. spoke to three of her cousins, as well as a detective one of her cousins had three-way called. The detective asked where A.C. was but she was unable to tell him because Jones hung up the phone.

[7]     At some point, Madden returned and A.C. and Jones got into the car with him. A.C. sat in the front passenger seat and Madden told her to "lay back so no one can see" her. *Id.* at 217. Madden dropped A.C. off in a neighborhood where she did not know anyone. Before A.C. exited the car, Madden told her to "tell the police that [she] was off drugs and that [she] took a Molly and . . . woke up like that and to remember his face." *Id.* A.C. walked up to a stranger's house, knocked on the door, and asked the individual who answered to call her cousin. The stranger contacted A.C.'s cousin. Another cousin picked A.C. up and took her to the hospital. A.C. was bleeding from her mouth, ear, and nose. Her face was swollen, and she had severe burns. As a result, A.C. has undergone several surgeries and rehabilitative therapy. A.C. also has permanent scarring.

[8]     On October 29, the State charged Madden with robbery resulting in serious bodily injury, a Level 2 felony; criminal confinement, a Level 3 felony; three counts of aggravated battery, Level 3 felonies; kidnapping, a Level 5 felony;

battery resulting in bodily injury, a Level 5 felony; battery by means of a deadly weapon, a Level 5 felony; and pointing a firearm, a Level 6 felony. *See* Appellant's Appendix, Volume II at 28-30. The State later amended the charging information to add kidnapping for ransom and criminal confinement, Level 2 felonies. Upon the State's motion, Madden's robbery resulting in serious bodily injury, battery by means of a deadly weapon, pointing a firearm, and one of the aggravated battery charges were dismissed. A jury trial was held December 9 to 11, 2019. Madden and Jones were tried together. The jury found Madden guilty of two counts of aggravated battery, Level 3 felonies; kidnapping with bodily injury, a Level 5 felony; kidnapping for ransom, a Level 2 felony; and criminal confinement with intent to obtain ransom, a Level 2 felony.

[9] A sentencing hearing was held on January 6, 2020. The trial court sentenced Madden to an aggregate of forty years in the Indiana Department of Correction: ten years for each battery conviction to run consecutively to each other; twenty years for Level 2 kidnapping and twenty years for Level 2 confinement to run concurrently to each other but consecutively to the battery sentences; and four years for Level 5 kidnapping to run concurrently to all other sentences. *See* Tr., Vol. 4 at 150-51; Appellant's App., Vol. II at 144-45. Madden now appeals.

# Discussion and Decision

# I. Sufficiency of the Evidence

Madden challenges the sufficiency of the evidence supporting his kidnapping for ransom conviction, a Level 2 felony.

## A. Standard of Review

When reviewing the sufficiency of the evidence required to support a conviction, we do not reweigh the evidence or judge the credibility of the witnesses. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). Instead, we consider only the evidence supporting the verdict and any reasonable inferences that can be drawn therefrom. *Morris v. State*, 114 N.E.3d 531, 535 (Ind. Ct. App. 2018), *trans. denied*. We consider conflicting evidence most favorably to the verdict. *Silvers v. State*, 114 N.E.3d 931, 936 (Ind. Ct. App. 2018). "We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). The evidence need not overcome every reasonable hypothesis of innocence; it is sufficient if an inference may reasonably be drawn from the evidence to support the verdict. *Silvers*, 114 N.E.3d at 936. The uncorroborated testimony of one witness may be sufficient by itself to sustain a conviction on appeal. *Toney v. State*, 715 N.E.2d 367, 369 (Ind. 1999).

## B. Kidnapping for Ransom

Madden did not make the ransom demand himself; therefore, the State proceeded on an accomplice liability theory on this charge. "A person who

knowingly or intentionally removes another person, by fraud, enticement, force, or threat of force, from one place to another" with the intent to obtain ransom commits kidnapping, a Level 2 felony. Ind. Code § 35-42-3-2(a), (b)(3)(A) (2014). Under Indiana's accomplice liability statute, a person "who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense[.]" Ind. Code § 35-41-2-4. It is not necessary that the evidence show the accomplice personally participated in the commission of each element of the offense. *Pugh v. State*, 52 N.E.3d 955, 966 (Ind. Ct. App. 2016), *trans. denied.* A person who aids another in committing a crime is just as guilty as the actual perpetrator. *Id.* "[T]he accomplice is criminally responsible for everything which follows incidentally in the execution of the common design, as one of its natural and probable consequences, even though it was not intended as part of the original design or common plan[.]" *Griffin v. State*, 16 N.E.3d 997, 1003 (Ind. Ct. App. 2014) (internal quotation omitted).

[13] To determine whether a defendant aided another in the commission of the crime, the fact-finder considers: (1) presence at the crime scene; (2) companionship with another engaged in a crime; (3) failure to oppose the commission of the crime; and (4) the course of conduct before, during, and after the occurrence of the crime. *Wright v. State*, 950 N.E.2d 365, 368 (Ind. Ct. App. 2011). As a general rule, mere presence at the scene of the crime is not itself sufficient to allow an inference of participation in the crime. *Griffin v. State*, 413 N.E.2d 293, 295 (Ind. Ct. App. 1980). Such presence may, however, be

considered with other evidence as a factor in determining a defendant's guilt. *Id*.

[14] Here, all four factors demonstrate that Madden actively participated in A.C.'s kidnapping for ransom. When Jones and A.C. arrived at Madden's house, Madden physically grabbed A.C., pulled her from the vehicle, and took her into the basement, where Jones handcuffed her to a pipe. Later, after A.C. got out of the handcuffs, Madden brought out a chair and A.C. was handcuffed to the chair. Madden threw hot water on A.C., beat her head with a pot, stomped on her, and punched her. Once A.C. was in the bathroom, Madden again threw hot water on her and beat her. While they were in the bathroom, Jones called several people and asked about the package. Jones and Madden discussed what to do with A.C. and Madden asked if he could kill her, but Jones said she should be let go. When the three went upstairs, Madden left to get gas and Jones instructed A.C. to call her family and demand $3,000 to let her go. When Madden returned, they drove to a neighborhood and dropped A.C. off.

[15] Madden was present during the crime and actively participated in the kidnapping in an attempt to get money; he and Jones were clearly companions, working together to kidnap A.C. and seek ransom in exchange for her freedom; Madden never opposed the crime; and his conduct before, during, and after the crime only demonstrate his active participation in the crime with Jones. The fact that Madden briefly left the house to get gas and was not physically present when Jones instructed A.C. to call her family and ask for money does not relieve Madden of liability. Jones' seeking ransom was a natural and probable

consequence of their plan to kidnap A.C. As stated above, accomplice liability does not require the individual to participate in every aspect or element of the crime. *Pugh*, 52 N.E.3d at 966. And the accomplice is responsible for all natural and probable consequences that follow the execution of the common plan regardless of whether or not it was initially intended. *Griffin*, 16 N.E.3d at 1003. We conclude there is sufficient evidence from which a reasonable jury could infer Madden knowingly or intentionally kidnapped A.C. with the intent to obtain ransom. Madden's conviction for Level 2 felony kidnapping is affirmed.

## II. Double Jeopardy

[16]   Next, we address Madden's claim that his convictions for two counts of aggravated battery and his convictions for two counts of kidnapping and criminal confinement violate the continuous crime doctrine.

[17]   Before briefs were filed in this case, our supreme court issued two decisions that changed Indiana's precedent concerning double jeopardy claims based on multiple convictions in a single prosecution. *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020); *Powell v. State*, 151 N.E.3d 256 (Ind. 2020). "The Court distinguished these claims of 'substantive double jeopardy' from claims of 'procedural double jeopardy' – where a defendant is charged with the same offense in successive prosecutions." *Hill v. State*, 157 N.E.3d 1225, 1228 (Ind. Ct. App. 2020). Prior to *Wadle* and *Powell*, we reviewed substantive double jeopardy claims under the constitutional tests from *Richardson v. State*, 717

N.E.2d 32 (Ind. 1999), namely the "actual evidence" and "statutory elements" tests, as well as other rules of statutory construction and common law. *Wadle*, 151 N.E.3d at 243. However, *Wadle* overruled the *Richardson* constitutional tests and set forth a new framework for analyzing substantive double jeopardy claims. *Id.* at 235.

[18]    Madden filed his brief after *Wadle* and *Powell* were decided but did not address the changes these two cases brought to double jeopardy jurisprudence, even in his reply brief after the State specifically addressed those cases. Madden analyzes his claims under the continuous crime doctrine, a common law formulation. However, a panel of this court recently held that *Wadle* and *Powell* "not only overruled the constitutional substantive double jeopardy test in *Richardson*, they also swallowed statutory and common law to create one unified framework for substantive double jeopardy claims – including the continuous crime doctrine." *Jones v. State*, 159 N.E.3d 55, 61 (Ind. Ct. App. 2020), *trans. pending*; *see also Hill*, 157 N.E.3d at 1229. We agree. Therefore, we evaluate Madden's claims under the framework set forth in *Wadle* and *Powell*.

[19]    Substantive double jeopardy claims come in two varieties: (1) when a single criminal act or transaction violates one statute but harms multiple victims; and (2) when a single criminal act or transaction violates multiple statutes with common elements and harms one or more victims. *Wadle*, 151 N.E.3d at 247; *Powell*, 151 N.E.3d at 263. "*Wadle* established the test for the latter scenario, *Powell* the former." *Hill*, 157 N.E.3d at 1228.

## A.  *Powell*

[20]    We analyze Madden's claims that his two aggravated battery convictions and his convictions for both kidnapping as a Level 5 felony and as a Level 2 felony violate substantive double jeopardy by employing the test set forth in *Powell*.

[21]    "In resolving a claim of multiplicity, our task is to determine whether the statute permits punishment for a single course of criminal conduct or for certain discrete acts – the 'successive, similar occurrences' – within that course of conduct." *Powell*, 151 N.E.3d at 264 (quoting *Hines v. State*, 30 N.E.3d 1216, 1220 (Ind. 2015)).  This inquiry is a two-step process:

> First, we review the text of the statute itself.  If the statute, whether expressly or by judicial construction, indicates a unit of prosecution, then we follow the legislature's guidance and our analysis is complete.  *See Hurst[ v. State*, 464 N.E.2d 19, 21 (Ind. Ct. App. 1984)] (whether "multiple offenses of the same statute are committed during a single transaction" depends "on the definition of the particular crime involved").  But if the statute is ambiguous, then we proceed to the second step of our analysis.
>
> Under this second step, a court must determine whether the facts – as presented in the charging instrument and as adduced at trial – indicate a single offense or whether they indicate distinguishable offenses.  To answer this question, we ask whether the defendant's actions are "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." *Walker v. State,* 932 N.E.2d 733, 735 (Ind. Ct. App. 2010), *cited with approval by Hines,* 30 N.E.3d at 1219.  If the defendant's criminal acts are sufficiently distinct, then multiple convictions may stand; but if those acts are continuous and indistinguishable, a court may impose only a

single conviction. *Armstead v. State*, 549 N.E.2d 400, 402 (Ind. Ct. App. 1990). Any doubt counsels "against turning a single transaction into multiple offenses." *Duncan v. State*, 274 Ind. 457, 464, 412 N.E.2d 770, 775 (1980)[.]

*Id.* at 264-65 (footnotes omitted).[2] We review questions of statutory law de novo. *Id.* at 262. To aid in determining the unit of prosecution when the statute does not contain an express unit of prosecution, the *Powell* court distinguished conduct-based statutes from result-based statutes and explained:

> A conduct-based statute . . . consists of an offense defined by certain actions or behavior (*e.g.* operating a vehicle) and the presence of an attendant circumstance (*e.g.,* intoxication). . . . A result-based statute . . . consists of an offense defined by the defendant's actions and the results or consequences of those actions. In crimes such as murder, manslaughter, battery and reckless homicide, the gravamen of the offense is causing the death or injury of another person, i.e., the result is part of the definition of the crime. In other words, the resulting death, injury or offensive touching is an element of the crime. . . . Under these statutes, then, where several . . . injuries occur in the course of a single incident, the prohibited offense has been perpetrated several times over. . . . In short, crimes defined by conduct (rather than by consequence) permit only a single conviction (with multiple consequences resulting in enhanced penalties, not multiple crimes). But crimes defined by consequences (rather than by conduct) permit multiple convictions when multiple consequences flow from a single criminal act.

---

[2] This court has found that *Powell* "incorporated the continuous crime doctrine into its uniform substantive double jeopardy framework." *Jones*, 159 N.E.3d at 62.

*Id.* at 265-66 (internal quotations, emphases, and citations omitted).

### i. *Aggravated Battery Convictions*

[22]     We first address whether Madden's two aggravated battery convictions violate substantive double jeopardy. "A person who knowingly or intentionally inflicts injury on a person that creates a substantial risk of death or causes . . . serious permanent disfigurement . . . commits aggravated battery, a Level 3 felony." Ind. Code § 35-42-2-1.5. Because the gravamen of this offense is the injury of another person, it is a result-based statute. A panel of this court addressed the very same question in Madden's co-defendant's direct appeal and stated, "each time Madden threw hot water on A.C. could support a separate battery claim. However, how this result-based statute applies when there is a single victim who suffered multiple, substantially similar injuries because of multiple instances of the same act is ambiguous." *Jones*, 159 N.E.3d at 63-64. Accordingly, we move to the second step in *Powell* and "we ask whether the defendant's actions are so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." *Powell*, 151 N.E.3d at 264 (quotation omitted).

[23]     Here, we conclude that Madden's two acts of throwing hot water on A.C. were not continuous and therefore, do not constitute a single transaction. The record reveals that A.C. was taken to the basement of Madden's house and handcuffed to a pipe. When she escaped from the cuffs, she was handcuffed to a chair near the bar/kitchen area where Madden threw hot water on her. Madden and Jones questioned A.C. about the package. A.C. then attempted to move to a

corner, but Madden hit her with a pot and beat her. A.C. then stood up and went into the bathroom. Jones closed the door. A.C. took her clothes off, as instructed, and Madden opened the door and threw hot water on her again. The two acts of throwing hot water on A.C. did not occur at the same time, in the same place, and did not share a purpose. The first time Madden threw hot water on A.C. was when she was clothed and handcuffed to a chair in the kitchen area while questioning her about the missing package. The second act occurred later, while A.C. was in the bathroom and unclothed. And the purpose of the second act appeared to be punitive. We also agree that "[b]ecause one battery occurred while A.C. was clothed, and one while she was not, it would be reasonable to infer that they resulted in different injuries." *Jones*, 159 N.E.3d at 64. The two acts of throwing water on A.C. were distinguishable offenses. Because the two batteries were separated by time, place, and purpose, they were not part of a single transaction. Accordingly, Madden's two aggravated battery convictions are affirmed.

### ii. Level 2 Kidnapping for Ransom and Level 5 Kidnapping

[24] Madden also argues his multiple convictions for kidnapping violate the continuous crime doctrine. *See* Brief of the Appellant at 24. Specifically, Madden contends, and the State agrees, that his conviction for Level 2 felony kidnapping may stand but his Level 5 felony kidnapping conviction must be vacated. *See* Brief of Appellee at 16.

[25] "A person who knowingly or intentionally removes another person, by fraud, enticement, force, or threat of force, from one place to another commits

kidnapping." Ind. Code § 35-42-3-2(a). Madden was charged with two violations of this statute: one offense was elevated to a Level 5 felony because the kidnapping resulted in bodily injury to A.C. and the other offense was elevated to a Level 2 felony because it was committed with the intent to obtain ransom. Ind. Code §§ 35-42-3-2(b)(1)(C), (3)(a) (2014). This is a conduct-based statute because the gravamen of the offense is the action of removing the victim. Here, there is no question that only one removal occurred: Madden's forceful removal of A.C. from Jones' car into the basement. "The only things that distinguish the Level [5] conviction (injury) from the Level [2] conviction (ransom) are result and motive. These are not the units of prosecution for kidnapping." *Jones*, 159 N.E.3d at 65. Therefore, only one can stand, which, in this case, is the Level 2 felony. *See id.* ("[T]he lesser felony should fall."). We remand to the trial court with instructions to vacate Madden's Level 5 felony kidnapping conviction and amend its judgment to remove the conviction and sentence on this count.

## B. *Wadle*

[26]     *Wadle's* double jeopardy framework applies when a single criminal act or transaction violates multiple statutes with common elements. In such a case,

> we first look to the statutes themselves. If either statute clearly
> permits multiple punishment, whether expressly or by
> unmistakable implication, the court's inquiry comes to an end
> and there is no violation of substantive double jeopardy. But if
> the statutory language is not clear, then a court must apply our
> included-offense statutes to determine whether the charged
> offenses are the same. *See* I.C. § 35-31.5-2-168. If neither offense

is included in the other (either inherently or as charged), there is no violation of double jeopardy. But if one offense is included in the other (either inherently or as charged), then the court must examine the facts underlying those offenses, as presented in the charging instrument and as adduced at trial. If, based on these facts, the defendant's actions were "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction," then the prosecutor may charge the offenses as alternative sanctions only. But if the defendant's actions prove otherwise, a court may convict on each charged offense.

*Wadle*, 151 N.E.3d at 253.

[27] Madden argues that both his Level 2 kidnapping and criminal confinement convictions cannot stand. The State concedes that under the *Wadle* test, Madden is correct. Looking first to the statutory language, Level 2 kidnapping is committed by "[a] person who knowingly or intentionally removes another person, by fraud, enticement, force, or threat of force, from one place to another[,]" with the intent to obtain ransom. Ind. Code § 35-42-3-2(a), (b)(3)(A) (2014). And Level 2 criminal confinement is committed by "[a] person who knowingly or intentionally confines another person without the other person's consent[,]" with the intent to obtain ransom. Ind. Code § 35-42-3-3(a), (b)(3)(A) (2014). Because neither statute permits multiple punishment, we move to the second step of the statutory analysis and apply our included-offense statutes to determine statutory intent. *Wadle*, 151 N.E.3d at 253; *Barrozo v. State*, 156 N.E.3d 718, 723 (Ind. Ct. App. 2020).

Indiana Code section 35-38-1-6 states that a trial court may not enter judgment of conviction and sentence for both an offense and an included offense. An "included offense" is defined as an offense that:

> (1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;

> (2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or

> (3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability, is required to establish its commission.

Ind. Code § 35-31.5-2-168. "If neither offense is included in the other (either inherently or as charged), there is no violation of double jeopardy." *Wadle*, 151 N.E.3d at 248.

In this case, subsection (1) is implicated:

> Criminal confinement requires proof of the same but fewer criminal elements as kidnapping. A kidnapper must act "by fraud, enticement, force, or threat of force," whereas criminal confinement must be done without consent. Consent is a "voluntary yielding to what another proposes or desires." Consent, Black's Law Dictionary (11th ed. 2019). Non-consent is established by the methods noted in the statute of "fraud, enticement, force, or threat of force." Kidnapping requires removal from one place to another, while criminal confinement requires an act of confinement. In removing someone from one place to another, a kidnapper has confined that person to those

places. The element of confinement is a necessary part of forced removal. As such, confinement is a lesser included offense of kidnapping.

*Jones*, 159 N.E.3d at 66 (footnote omitted). We also note that Madden's enhancements were identical; both offenses were elevated to a Level 2 felony because the offenses were committed with the intent to obtain ransom. *See* Ind. Code §§ 35-42-3-2(b)(3)(A) (2014), 35-42-3-3(b)(3)(A) (2014).

[30] Because criminal confinement is included in kidnapping, we must examine the underlying facts to determine whether Madden's actions were "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction" such that his convictions for criminal confinement and kidnapping violate double jeopardy. *Wadle*, 151 N.E.3d at 253. Here, the same facts proved Madden's conviction for criminal confinement and kidnapping – that he forced A.C. from the car and into the basement where she was handcuffed. And because Madden acted with the intent to obtain ransom, both convictions were enhanced to Level 2 felonies. Madden's actions were so compressed in time, place, singleness of purpose, and continuity of action that his convictions for both crimes violate double jeopardy. Accordingly, we remand with instructions for the trial court to vacate the included offense, namely Madden's Level 2 felony criminal confinement conviction, and amend its judgment to remove the conviction and sentence on this count. *See* Ind. Code § 35-38-1-6 (stating that when a defendant is charged with an offense and an included offense in separate counts and is found guilty

of both counts, the trial court cannot enter a judgment and sentence for the included offense).

[31]  In sum, Madden's two aggravated battery convictions do not constitute double jeopardy and are therefore affirmed.  Madden's Level 5 felony kidnapping and criminal confinement convictions do constitute double jeopardy in relation to his Level 2 felony kidnapping conviction.  Therefore, his convictions for Level 5 felony kidnapping and criminal confinement must be vacated and his conviction for Level 2 kidnapping is affirmed.

# III.  Sentencing Abuse of Discretion

[32]  Madden challenges the trial court's imposition of consecutive sentences as an abuse of discretion.  He claims because "all of [his] acts were part of a single continuous crime . . . the sentences should be concurrent."  Br. of the Appellant at 27.  We disagree.

> Sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.  A trial court may abuse its discretion by failing to enter a sentencing statement, entering findings of aggravating and mitigating factors unsupported by the record, omitting factors clearly supported by the record and advanced for consideration, or giving reasons that are improper as a matter of law.

*Stokes v. State*, 947 N.E.2d 1033, 1036 (Ind. Ct. App. 2011) (citations and quotations omitted), *trans. denied*.

[33] A trial court may order consecutive sentences based on one valid aggravating factor. *Kayser v. State*, 131 N.E.3d 717, 723 (Ind. Ct. App. 2019). And that one valid aggravator may be used both to enhance a sentence and to justify consecutive sentences. *Id.* Here, the trial court found several aggravating factors, including Madden's criminal history and the nature of the offense, and ordered the sentences for his two aggravated battery convictions and his Level 2 kidnapping conviction to be served consecutively to each other. Madden does not argue the trial court improperly found an aggravating factor. Therefore, the trial court found at least one valid aggravating factor and did not abuse its discretion in imposing consecutive sentences.

## IV. Inappropriate Sentence

### A. Standard of Review

[34] Article 7, sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of sentences through Indiana Appellate Rule 7(B). *King v. State*, 894 N.E.2d 265, 267 (Ind. Ct. App. 2008). Rule 7(B) provides, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Sentencing decisions rest within the discretion of the trial court and, as such, should receive considerable deference. *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's

character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[35] The defendant bears the burden of demonstrating his sentence is inappropriate under the standard, *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006), and we may look to any factors in the record in making such a determination, *Reis v. State*, 88 N.E.3d 1099, 1102 (Ind. Ct. App. 2017). Ultimately, "whether we regard a sentence as [in]appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224. And the principal role of this court in reviewing of a defendant's sentence is "not to achieve a perceived 'correct' result in each case[,]" but to attempt to leaven the outliers. *Id.* at 1225. Thus, the question is *not* whether the defendant's sentence is appropriate or another sentence is *more* appropriate; rather, the test is whether the sentence is inappropriate. *Perry v. State*, 78 N.E.3d 1, 13 (Ind. Ct. App. 2017).

## B. Nature of the Offenses

[36] We begin our analysis of the "nature of the offense" prong with the advisory sentence. *Reis*, 88 N.E.3d at 1104. The advisory sentence is the starting point the Indiana legislature has selected as an appropriate sentence for the committed crime. *Childress*, 848 N.E.2d at 1081. The sentencing range for a Level 2 felony is between ten and thirty years, with an advisory sentence of seventeen and one-half years. Ind. Code § 35-50-2-4.5. The sentencing range

for a Level 3 felony is a fixed term between three and sixteen years, with an advisory sentence of nine years. Ind. Code § 35-50-2-5(b). Therefore, Madden faced a maximum prison sentence of sixty-two years for his two aggravated battery convictions, both Level 3 felonies, and his kidnapping for ransom conviction, a Level 2 felony. However, he received forty years.

[37] The nature of the offense is found in the details and circumstances of the offenses and the defendant's participation therein. *Lindhorst v. State*, 90 N.E.3d 695, 703 (Ind. Ct. App. 2017). When determining the inappropriateness of a defendant's sentence that deviates from the advisory sentence, we consider whether there is anything more or less egregious about the offense as committed by the defendant that distinguishes it from the typical offense accounted for by our legislature when it set the advisory sentence. *Moyer v. State*, 83 N.E.3d 136, 142 (Ind. Ct. App. 2017), *trans. denied*. Here, Madden was sentenced to ten years for each aggravated battery conviction, which is one year above the advisory sentence. He was sentenced to twenty years for his kidnapping conviction, two and one-half years above the advisory sentence.

[38] There is no question that the nature of Madden's offenses is egregious. Madden participated in kidnapping A.C. and repeatedly beat, kicked, and punched her while she was handcuffed, causing her to go in and out of consciousness. He also threw hot water on her twice. As a result, A.C. suffered severe burns and has undergone various procedures. A.C.'s mother testified at the sentencing hearing that after A.C.'s first surgery, A.C. had to go to physical therapy to improve her ability to walk. She also testified that A.C. has experienced "gut

wrenching pain" from her injuries. Tr., Vol. 4 at 85. Due to her burns, A.C. had to change her bandages twice a day for several months and then once a day for a while longer. As A.C. changed her bandages, she would cry out in pain. Because of Madden's actions, A.C. has undergone several surgeries, will likely need significant medical treatment over a very long period, and has permanent scarring. We are unpersuaded that the horrific nature of Madden's offenses renders his sentence inappropriate.

## C. Character of the Offender

[39] Madden argues his sentence is inappropriate because of his good character. He argues, "Despite the evidence at trial, [he] did not present the court with a hardened character requiring many years of incarceration in order to remold and shape him into a law-abiding citizen. Rather, [he] showed himself to be a man remorseful for his actions, and struggling with substance abuse, but with a willingness to seek treatment." Br. of the Appellant at 30-31.

[40] We conduct our review of a defendant's character by engaging in a broad consideration of his or her qualities. *Moyer*, 83 N.E.3d at 143. And a defendant's life and conduct are illustrative of his or her character. *Morris*, 114 N.E.3d at 539. A defendant's criminal history is one relevant factor in analyzing his or her character, the significance of which varies based on the "gravity, nature, and number of prior offenses in relation to the current offense." *Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007).

Madden's criminal history is comprised of true findings for theft and resisting law enforcement as a juvenile and two misdemeanor convictions as an adult. Madden has also had his probation revoked. Although Madden's criminal history is not significant, "[e]ven a minor criminal record reflects poorly on a defendant's character[.]" *Reis*, 88 N.E.3d at 1105.

In sentencing Madden, the trial court found as mitigating factors his substance abuse, remorse, and that a prolonged period of incarceration would be an undue hardship on his family. We, too, recognize that the record shows Madden has two young children, expressed remorse at sentencing, and has struggled with substance abuse. We also acknowledge that Madden has participated in various programs while incarcerated, including a religious program, parenting classes, substance abuse classes, and anger management. However, Madden's criminal history, the egregious nature of his offenses, and the permanent physical and emotional harm inflicted on A.C. outweigh these factors. Madden faced a maximum sentence of sixty-two years for his offenses but received forty. We cannot conclude his character is so stellar as to render his sentence inappropriate.

In sum, we cannot conclude Madden's forty-year sentence is inappropriate in light of the nature of the offenses or his character. Accordingly, we decline to revise his sentence.

# Conclusion

For the reasons set forth above, we conclude the evidence is sufficient to support Madden's kidnapping for ransom conviction, the trial court did not abuse its discretion by imposing consecutive sentences, and his sentence is not inappropriate. We conclude that Madden's aggravated battery convictions do not constitute double jeopardy and are therefore affirmed. Madden's convictions for Level 5 felony kidnapping and criminal confinement do constitute double jeopardy in relation to his Level 2 felony kidnapping conviction. Therefore, we remand to the trial court with instructions to vacate Madden's Level 5 felony kidnapping and criminal confinement convictions and amend its judgment accordingly.

Affirmed in part, reversed and remanded in part.

Bailey, J., and Tavitas, J., concur.